UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                Plaintiff,                        S1 09 CR 587 (ILG)

       v.

DMITRIY YAKOVLEV, *et al.*,

                Defendants.

---

Defendant Dmitry Yakovlev's
Memorandum of Law

This Memorandum is submitted in support of the defendant Dmitriy Yakovlev's Motion to Suppress and Motion In Limine.

Point I

The Search Warrant for the Surf Avenue House Was Without Probable Cause and Improperly Executed

The search warrant issued to recover human remains under the basement floor of 4614 Surf Avenue, Brooklyn, New York, the defendant's residence, was wholly lacking in probable cause and was improperly executed. Accordingly the fruits of the search and seizure must be suppressed.

It is elemental that before a search warrant issues there must be probable cause to believe that evidence of a federal crime exists on specified premises. *New York v. Belton,*

*101 S.Ct. 2860, 453 U.S. 454 (1981); Brinegar v. U.S. 69 S.Ct 1302, 338 U.S. 160,( 1949); Carroll v. United States, 45 S.Ct. 280, 267 U.S 132 (1925); FRCP Rule 41.* The items and place to be seized must be particularized in order to ensure against the improper issuance of general warrants. *Lo-Ji Sales, Inc. v. New York, 99 S.Ct. 2319, 442 U.S. 319 (1979).* Not only must the warrant contain probable cause, but its execution must be limited to a seizure of specified items within the scope of the authorized area of the search**.** *U.S v. Dzialak, 441 F.2d 212, cert. denied 92  S.Ct. 218, 404 U.S. 883 (1971)( warrant authorizing seizure of bicycle, hosiery and binoculars does not permit seizure of watches.).* Items seized that are not described in the warrant are inadmissible unless they are otherwise subject to a seizure and have a reasonable relationship to the purpose of the search. *Arizona v. Hicks, 107 S.Ct.1149, 480 U.S. 321 (1987);* "In describing the property to be seized, nothing is left to the discretion of the officer executing the warrant" *U. S. v Baldwin 46 F.R.D. 63, 65 ( DCNY 1969).*  These principals were egregiously violated in both the acquisition and execution of the warrant.

The government sought permission in two consecutive warrants in August, 2009, to unearth the basement of the defendant's residence in order to search for the human remains of Irina Malezhik, who reportedly disappeared in 2007. The accompanying affidavit in support of the warrant is replete with itemized instances of post-disappearance usage of credit cards, ATM's and checks by the defendant and his co-defendant wife. After delineating this detailed usage, the affidavit further alleges that in  September or October,2007,  perhaps before the alleged disappearance, defendant Yakovlev admired the basement reconstruction by a friend and expressed interest in doing the same to his own home. According to the CW, Yakovelev declined to pay the CW to do the work and indicated that he wanted to do it himself. Defendant Yakovelev thereafter borrowed a cement mixer from the cooperating individual and apparently made substantial changes to his floor. Approximately 9 months later, Yakovelev hired

the CW to help him finish the project and clear some dirt and rock debris, which the CI claimed to exude a foul odor. Yakovelev explained to the CW that a pet had urinated and defecated in the basement, causing the odor, and, according to the CW, the odor dissipated with the removal of the sandy debris. The odor was neither foul nor unusual enough to cause the CW to go to the police or otherwise express any suspicions to law enforcement. He seemingly did not suspect any illegal conduct as the cause of the odor and, as related in the affidavit, is a suretor securing the release of Yakovlev's wife and co-defendant in this case.

Based upon this information, the government sought and received authorization to tear up the basement floor in search of Irina Malezhik's human remains. Nothing more was offered to establish a time, manner or cause of death. No evidence was submitted to indicate that Malezhik was murdered, let alone that Yakovlev had murdered her. No one saw her enter the defendant's home or observed him moving suspicious bags or other containers that might have hidden her body. The entirety of the proffered proof was that unauthorized use of financial instruments took place after her supposed disappearance.  This claim was made even though her phone records reflect usage *after* the date of her supposed disappearance and the use of her credit cards by the Yakovlev's.

While probable cause is an individual case by case determination, a mere belief that probable cause exists without accompanying facts to support that belief do not justify a search. *Aguilar v. Texas 84 S.Ct. 1509, 378 U.S. 108 ( 1964).* "There had to be particular facts indicating that, at the time of the search, the [basement floor] or a container within it, carried contraband, evidence of crime, or other siezable matter". *U.S. v. Infante-Ruiz, 13 F.3d 498, 502, (1st Cir. 1994).* Here, there was no nexus between

the recited facts and the ultimate conclusion that human remains were probably under the basement floor.

The combined factual suggestion of the affidavit does not give rise to a rational belief that human remains were buried in the basement. The use of financial instruments post-alleged disappearance in and of itself would certainly not give rise to a belief that a body was buried in the defendant's home. The insinuation of the added element of a foul odor emanating from the basement and Yakovlev's construction work in the basement are clearly offered to create the illusion of a nexus between her disappearance and the allegedly unauthorized financial transactions and asks the Court to take a wild leap of assumptions to believe that the foul odor was the decomposing body of Irina Malezhik many months after her presumed murder. This assumption added to unsubstantiated belief and insinuation simply does not rise to the level of probable cause.

Again, the crucial fact that undoubtedly lent assurance of probable cause to the issuing Magistrate was the alleged foul odor. However, an examination of the affidavit completely undermines its import. Putting aside that a family with two young children resided in the home at all times, the government offered a single statement from one person that alleged the existence of a foul odor emanating from the basement at least a year before the search. This is hardly the type of timely or substantive proof required to justify a search. There is no evidence that the agents canvassed neighbors or friends more contemporaneously to see if any odor or other suspicious activity could be currently linked with the basement or the home. If there was such a canvas and it produced no such information, the agents were obligated to reveal that result to the issuing magistrate. Conversely, the failure to try to update the year old information was tantamount to a reckless disregard for the truth. Either way, a hearing is warranted. *Franks v. Delaware, 98 S.Ct. 2674, 438 U.S. 154 (1978).*

While the CW reports the existence of foul odor, he also critically adds that the odor dissipated with the removal of the sand and debris that was on top of the reconstructed basement floor. Surely, if, as the government assumed in its affidavit, the body remained under the floor, the odor would have continued *after* the removal of the dirt because the ultimate cause of the smell, the decomposed body, remained therein. Therefore, by definition, if the smell basically disappeared after removal of some topical dirt, there was no reason, let alone probable cause, to believe that any human remains were buried below. This should have been obvious to the agents and does not give rise to any good faith exceptions in the execution of the warrant. *United States v. Leon, 468 U.S. 897 (1984).* The deliberate update and corroborate the CW's information only confirms the knowing lack of a good faith basis to search.

The flawed and illegal execution of the warrant was even more obvious. The entirety of the application and the scope of the conferred authority to search was discreet and clear. The agents were authorized to search for human remains expected to be located below the basement floor of his residence. No other authorization was sought or received. Nevertheless, during the search, agents seized ladies underwear found on the floor of the boiler room, keys and photographs from a file cabinet in the boiler room, a Russian language newspaper was removed from an open carton from the main area of the basement and a magazine about watches was taken from some unstated area on the ***second floor*** of the residence. All of these items must be suppressed.

To the extent that the government claims that some of these items were in plain view, the officers still had no right to seize them in the absence of probable cause. *Arizona v. Hicks, supra.* There was nothing incriminatory or illegal about a pair of underwear or a Russian language newspaper that, we believe, no one present could

even read. Clearly, none of these items could be described as being reasonably related to the purpose of the search, which was the discovery of human remains.

The error is even more pronounced as to those items seized from filing cabinets or on the second floor of the residence. Again, the scope of the search area was clearly defined; to wit, the basement floor. The item to be seized was equally circumscribed; to wit, human remains. Agents had no right or authorization to enter and remove items found in filing cabinets or the residential areas of the home and thereby accumulate whatever materials that struck their investigative fancy. They were limited in their authority and if they sought additional items they were compelled to seek additional and expanded authority to search. Curiously, they renewed their application 10 days after the original warrant issued since digging up the floor was not completed. Nowhere in the supplemental warrant application are these items mentioned or is permission sought to seize them. Similarly*, no mention is made of any odor emanating from the basement*. Instead, the agents just whisked up whatever material that interested them from wherever it could be found, regardless of the strictures of the warrant.

There is no good faith exception that permits search and seizure beyond the description of the warrant. *United States v. Schroeder, 129 F.3d 439 (8th Cir. 1997).* The area of permissible search was wildly exceeded when agents entered the residential portions of the home, the boiler room and began opening cabinets and grabbing personal belongings. Two years after the disappearance, agents seized non-contraband, indistinguishable and unidentifiable underwear, keys photographs and foreign language newspapers without search warrant authorization. The search request was limited in scope and definition and the agents grossly overreached both. Accordingly,

all materials seized, none of which were human remains or anything approximating or reasonably related to human remains, must be suppressed.

## Point II

### The Fruits of the Lexus Car Search Must Be Suppressed

In August 2010, almost three years after the disappearance of Irina Malazhik and almost five years after the death of Viktor Alexeyev, the government sought and received authorization to search the defendant's Lexus in anticipation of finding forensic trace evidence including hairs and fibers. Here again, the government recited the litany of instances that the defendants allegedly used credit cards and other financial instruments after her disappearance and added post arrest statements by Dmitriy Yakovlev indicating that she had been in his vehicle at some unspecified time in 2007.

Since she disappeared so long ago, in order to persuade the issuing Magistrate that there was probable cause to believe that evidence could still be obtained the agent swore that he had spoken to some unnamed fellow officer in the ERT, who advised him that hair and fibers "may" remain for many years. The absence of more specific scientific information from credible and named sources establishing the relative probability of such evidence being recovered three years after an event renders the warrant invalid. Simply put, while probable cause to search may have existed three years ago, there was no credible evidence that such evidence could have survived the passage of time and was likely to be recovered today.

Test results have yet to be completed on the hairs and fibers that were removed during the search.

It is not enough to show that probable cause existed at a prior time; probable cause must still exist at the time of the application. *U.S. v. Beltempo, 675 F.2d 472, (2nd Cir. 1982), cert. denied 102 S.Ct. 2963 (1982).* "While the statute does not fix the time within which proof of probable cause must be taken by the judge or commissioner, it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case." *Sgro  v. United States, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932).*

The affidavit fails to provide any reasonable assurance that the fibers, hair or other trace evidence of Irina Malezhik were likely to remain in the auto approximately three years after being in the vehicle. Unlike *Belton*, where the supporting affidavit provided information from a DEA chemist that trace elements of narcotics powder that had spilled on a rug would still be recoverable 52 days after the event, there was no expert opinion offered to advise the issuing court that almost three years after her disappearance fibers and hair remnants would likely be found. Instead, an unnamed agent in the Evidence Response Team advised the affiant that "biological and/or trace evidence, such as hairs and fibers, *may* remain in a location, such as a vehicle, for *many* years. (emphasis added).  (Affidavit paragraph 48.) He was further advised that "based on ERT's training and experience, there is probable cause to believe that biological and/or trace evidence, such as hairs and fibers, of Irina Malezhik *may* be found" in the car. (emphasis added) (Affidavit paragraph 48).

There was no indication of the training, expertise, experience, knowledge or any other indicia of reliability of the unnamed agent in the ERT or his/her information. Further, there was no explanation of the function or activities of the ERT, when this agent joined, what, if any specific training he had in the field of hair and fibers or any other identifying or elucidating information that would render any members opinion valuable.  Finally, the conclusory statement that probable cause existed based upon ERT's training and experience is wholly deficient. ERT is not a person but a team and has no experience or training. Rather, its members may have been trained and experienced and it would be a member's training and experience that would confer some legitimacy to the conclusion of probable cause. No such person is named or described.

In short, probable cause to believe that evidence *may* be found is insufficient. As stated in all its other applications for search warrants, probable cause to believe that evidence *will* be found is the appropriate standard. The affiant and other agents had to know and understand this essential distinction and the abject failure to satisfy the timeliness prong of the warrant. The lack of information about the unnamed agent providing the information about the hairs and fibers is akin to an informant providing unsubstantiated information in an affidavit. Whereas the reliability of the informant would have to be set forth to meet its burden of probable cause, here, too, some background and information to prove the reliability of the agent's information would also have to be proffered. *Spinelli v. United States, 89 S.Ct. 584, 393 U.S. 410 (1969).*

Where the warrant is facially defective, particularly because of the affiant's mistake or omission, there is no good faith exception that will cure it. *United States v. Ricciardelli, 998 F.2d 8 ( 1st Cir. 1993); United States v. Ellis, 971 F.2d 701 (11th Cir. 1992).*

The affiant provided deficient information and cannot claim to be unaware of its import. Proof that evidence would be present is crucial to the proper authorization of the warrant. The best that was offered was that it may be present based on no reported scientific reasoning or opinion from a named and trained individual. Accordingly, the evidence from the car search must be suppressed.

Point III

Graphic and Grotesque Photographs of Body  Parts Must Be Excluded

The government will seek to introduce a series of gruesome photographs allegedly depicting the dismembered body parts of Viktor Alexeyev. These photos add nothing but extreme prejudice to the quantum of proof and do not address any significant issues in the case. Moreover, the defense will stipulate that the body was dismembered which will enable any legitimate argument that the government may properly need to make. Therefore, the highly inflammatory photos must be excluded.

In or about 2006, trash bags containing body parts alleged to be Viktor Alexeyev were found on the side of a road in New Jersey. Photographs were taken that are nothing short of a revolting depiction of the discovery. The defendant Yakovlev is charged with killing, and presumable, dismembering the body to conceal it. The defense does not claim accident or mistake but, rather, denies the commission of the offense. We will stipulate to the dismemberment to allow the government to advance any appropriate theories or arguments. Without intent or accident in dispute, and with an offer of a stipulation to address any prosecutorial needs, there is simply no reason or purpose to inject highly inflammatory and prejudicial photos that will do nothing more

than distract, prevent and taint the jury's ability to assess the evidence in a fair and impartial manner.

Evidence that is otherwise admissible may, and should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Fed.R.Evid 403. United States v. Yazzie, 59 F3d 807, 811 (9th Cir. 1995).* Unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States, 519 U.S. 172, 180 (1997).* Evidence must be excluded if it " makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant <u>wholly apart from its judgment as to his guilt or innocence of the crime charged.</u>" *United States v. Johnson, 820 F.2d 1065, 1069 (9th Cir. 1987) ( emphasis in original).* Rule 403 requires exclusion "in those circumstances where the trial judge believes there is a genuine risk that emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Powers, 59 F.3d 1460, 1467 (4th Cir. 1995).*

Upon objection, such as here, it is incumbent upon the trial court to evaluate the probative value and the unfair prejudice and examine the availability of alternative means of proof, such as a stipulation, that may allow the probative value to shine without poisoning the jury. *Old Chief v. United States,, 519 U.S. 172 (1997); United States v. Merino-Balderrama, 146 F.3d 758 (9th Cir 1998).*In balancing the appropriate interests, it is clear that alternative and substitute proof is ample to replace the prejudicial introduction of the body parts photos.

11

While direct evidence will be offered to implicate the defendant Yakovlev in the unauthorized use of financial instruments, upon information and belief, there is no direct proof regarding the death of Viktor Alexeyev.  The government will not offer witness testimony to a murder of otherwise directly implicate the defendant in the alleged homicide. The lack of direct proof and reliance on a string of circumstantial evidence only heightens the concern over the prejudicial impact of the body parts photos. These pictures appeal and are designed to elicit precisely the type of emotional response decried by *Old Chief, Johnson* and *Yazzie*, that would adversely impact the jury's attitude towards the defendant and impair the jury from assessing the evidence at large in a fair and impartial manner.

The government will undoubtedly argue that this proof pertains to intent and to negate mistake or accident as a defense. However, none of these defenses will be offered. It is not anticipated that the defendant Yakovlev will do anything other than deny his complicity in the death of Viktor Alexeyev. His position is simple; someone else did it. Obviously, the Court's evaluation and balancing of the probative value and prejudice may alter of this intention changes. However, with his willingness to stipulate that the body parts were dismembered, whatever probative value of the photos is provided by this substitute and alternative means of proof. *United States v. Tavares, 21 F.3d 1 ( 1st Cir. 1994).*

We ask the Court to examine the originals of the photographs *in camera* and to preclude the government from mentioning them in its opening statement or offer them in evidence until such time as the Court may permit its introduction.

Point IV

All Scientific and Forensic Evidence Obtained From the Body Parts and Bags

<u>Must Be  Excluded</u>

Upon the discovery of body parts in numerous bags along the side of a highway in New Jersey in 2006, the government performed a variety of scientific and forensic tests to identify the body and preserve hairs and fibers that may be of evidentiary value. The government claims that the body is that of Viktor Alexeyev. The hairs and fibers have not yet been fully tested.

Subsequent to the testing, and before the defendant was even arrested, the body parts were either released to the family or destroyed. As well, the bags containing the body parts, were "fumed" in a fruitless attempt to find finger print evidence. In the process of the "fuming", all other possible trace, hair or fiber evidence was destroyed. Consequently, as a result of the deliberate destruction of the possible probative evidence during the fuming and the release or destruction of the body parts, there is no way for the defense to independently test the same matter or examine for additional hairs, fibers or other evidence that might exculpate the defendant or at least provide additional and different suspects. In light of the recently disclosed *Brady* information from a state inmate who apparently claims that others either committed or disposed of the body, this premature destruction of critical evidence is in itself, a death knell for the defendant. Accordingly, all evidence of scientific and other forensic testing must be excluded.

The Confrontation Clause states that in "all criminal cases, the accused shall enjoy the right…to be confronted with the witnesses against him." *U.S Const. amend. VI.*

In *Crawford v. Washington, 541 U.S. 36 (2004),* the Court set forth a new standard in evaluating the admissibility of hearsay statements at a criminal trial. While not explicitly defining the terms, the Court held that testimonial hearsay is only admissible if the defense had a prior opportunity to cross-examine the now unavailable declarant. *Id at 68,69*. In interpreting this decision, the Second Circuit was asked and declined to require the actual medical examiner who performed an autopsy to testify, but, rather, admitted the autopsy report through a summary witness on the grounds that business records were non-testimonial and excluded from *Crawford's* ambit. *United States v. Feliz 467 F.3rd 227 (2d Cir. 2006) cert. denied, 75 U.S.L.W. 3438 (2007).*

Subsequent to *Feliz*, the Supreme Court clarified its holding in *Crawford* and made clear that statements made with "an eye toward trial" fall within the definition of testimonial evidence and require the presence of the declarant before it could be admitted. *Davis v. Washington, 126 S.Ct. 2266 (2006).* In *Davis*, statements made during the course of police interrogation were deemed not testimonial if the "primary purpose of the interrogation is to enable police… to meet an ongoing emergency," but are testimonial if the purpose of the interrogation is to" establish or prove past events potentially relevant to later criminal prosecution." *Id. at 2273-74.*

The intentional destruction of evidence has long been judicially denounced and has provoked significant sanctions. *See United States v. Bufalino, 576 F.2d 446, 449 (2d Cir.), cert. denied, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). In United States v. Grammatikos, 633 F.2d 1013, 1019-20 (2d Cir. 1980),* the Second Circuit noted "the appropriateness and extent of sanctions in such situations depends upon a case-by-case assessment of the government's culpability for the loss, together with a realistic

14

appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof."

In *United States v. Beltempo, supra*, trace evidence of heroin was unintentionally destroyed during routine testing by government lab analysts as a natural consequence of the test. It was not preventable. As such, the Court reasoned that it did not warrant the sanction of exclusion of the evidence particularly where the expert who performed the tests was available. *United States v. Love, 482 F.2d 213, 218-19 (5th Cir.), cert. denied, 414 U.S. 1026, 94 S.Ct. 453, 38 L.Ed.2d 318 (1973); see United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969)*. In denying the application for exclusion, the Court highlighted the significance of the defendant's opportunity pursuant to Rule 16 to examine and test for additional trace evidence that would have likely remained on the vacuum bag that contained the original sample, thereby minimizing any argument that he was deprived of valuable *Brady* material. Here, to the contrary, any evidence remaining on the bags was also destroyed as a product of the fuming so there is no alternative available to the defense.

This is not a case of trace evidence being inevitably lost through the testing process. Bags were eradicated as potential sources of evidence through the arbitrary decision to conduct a specific test on the entire bag, inside and out. Surely, the government could have elected to perform the test in a more discreet manner that would have tested for fingerprints in likely places while still preserving the efficacy of the evidence. For example, the openings of the bags are far more likely to reveal fingerprints than the inside of the bags that were stuffed with body parts. Instead,they opted to perform a test of the outside and the inside of bags that contained the bloody body parts in a futile search for fingerprints and , by doing so, permanently eradicated

15

the possibility of any further examination. Other scientific methods could and should have been used to balance the need for fingerprint examination and the need to preserve the evidence.

Several courts have imposed sanctions for the deliberate destruction of evidence even if not done in bad faith. *See e. g. United States v. Loud Hawk, --- F.2d ---- (9th Cir. 1977) (dismissing indictment because of "good faith" but "deliberate" destruction of evidence); United States v. Harris, 543 F.2d 1247 (9th Cir. 1976) (FBI practice of destroying rough notes of interviews is improper); United States v. Higginbotham, 539 F.2d 17 (9th Cir. 1976) (destruction of photo array used in identification, but mere negligence involved by state officials could not be imputed to federal officials); Armstrong v. Collier, 536 F.2d 72 (5th Cir. 1976) (duty to preserve is applicable but insufficient prejudice proven to warrant reversal); United States v. Miranda, 526 F.3d 1319 (2d Cir. 1975); United States v. Augello, 451 F.2d 1167 (2d Cir. 1971) (duty to preserve tapes exists, but where no indication of bad faith or negligence, the destruction of the tapes did not call for sanctions); United States v. Pollock, 417 F.Supp. 1332 (D.Mass.1976) (Tauro, J.) (dismissing indictment because of government destruction of notes); cf. Killian v. United States, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961) (good faith destruction of FBI interim notes would not require new trial, but, bad faith destruction would warrant new trial absent harmless error)*

The combined force of, *inter alia*, *Crawford*, *Davis* and *Beltempo* is clear. Courts are extremely cognizant of the Confrontation Clause and its import in ensuring a fair trial. When the government discovered the dismembered body parts of Viktor Alexeyev, it was obvious that a crime had been committed and that future prosecution was inevitable. All tests performed were obviously done with an "eye toward trial" and to gather whatever evidence science would permit. Nevertheless, the most essential evidence of the crime-the body and the bags it was found in- was not preserved. The

16

Confrontation Clause, Rule 16 and any sense of fair play dictate that a criminal defendant have the right to confront the witnesses against him not merely through perfunctory, lip service cross examination but by meaningful questioning borne of independent testing of the expert's findings. By its actions, the government foreclosed that possibility as well as the ability to buttress the claim of the inmate that others may have been involved in the murder. As well, there is no opportunity to otherwise independently discover evidence that might prove material to the defense.

Without an opportunity to examine the body parts or bags to confirm the results of the DNA and other scientific tests and to possibly uncover material evidence that was ignored or overlooked, the cross examination will be limited to attacking the process of the examination rather than by affirmatively proving the existence of additional evidence that the government either did not or could not find. In light of the recent disclosure of the inmate exculpating the defendant, the obligation to preserve the body and bags for future examination and re-examination is more than academic. This is precisely why the government was obligated to preserve this most crucial evidence in the case. They should not stand to benefit from the one sided presentation of evidence that they themselves created by the willful destruction and/or release of evidence.

Concededly, bad faith in the destruction of evidence has been deemed necessary before a Due Process claim can be vindicated. *Arizona v. Youngblood 488 U.S 51(1988).* While we cannot read the minds of those who determined to dispose of this evidence and assert with authority that the destruction was predicated on an explicitly bad faith desire to deprive the defense of potential exculpatory material, the reckless decision to eliminate the most essential evidence in the prosecution of this offense is tantamount to bad faith. Any trained or even untrained investigator, prosecutor or technician had to

17

know the significance and necessity of preserving the single most important evidence of the crime to be charged. Every examination was presumably done in order to accumulate whatever evidence of prosecutorial value they could find. Such extensive testing belies any claim that the importance of preserving the primary evidence of the crime itself somehow escaped their attention.

However, even in denying a Due Process claim where the destruction of evidence in the ordinary course could not be expected to yield exculpatory evidence, the Court noted the distinction when the possibility of exculpatory evidence was more than mere speculation. *See United States v. Agurs 427 U.S. 97 (1976).* "Our most recent decision in this area of the law, *California v. Trombetta, 467 U. S. 479) (1984),* arose out of a drunk driving prosecution in which the State had introduced test results indicating the concentration of alcohol in the blood of two motorists. The defendants sought to suppress the test results on the ground that the State had failed to preserve the breath samples used in the test. We rejected this argument for several reasons: first, "the officers here were acting in good faith and in accord with their normal practice,'" id. at *467 U. S. 488*, quoting *Killian v. United States*, *368 U. S. 231, 368 U. S. 242* (1961); second, in the light of the procedures actually used, the chances that preserved samples would have exculpated the defendants were slim, *467 U.S. at 489*; and, third, even if the samples might have shown inaccuracy in the tests, the defendants had *"alternative means of demonstrating their innocence." Id. at 467 U. S. 490. (emphasis added).*

Here, even if there is no finding of bad faith, the prejudicial impact of the intentional and reckless destruction of essential evidence is self apparent particularly when viewed in conjunction with the inmate claim that others, not the defendant Yakovlev, may have participated in the homicide. There are no alternative means to test

the DNA of the body parts or hairs, fibers or other evidence on the bags or examine for additional forensic proof that might disclose the identity of the individuals suggested by the inmate. As well, while we advance a claim of a due process violation, the Confrontation Clause violation is independently viable and requires exclusion.

We are not unmindful of the sensitivities and desire of a family to inter the deceased. If, in fact, the body parts were released to the family, it is understandable. However, that is not a justification to permit the one sided introduction of evidence where the defense has no meaningful opportunity to challenge or rebut the essential findings. The government has secured gruesome photos that they wish to present to the jury. At the least, they also should have taken microscopically exact photographs of every body part and the entirety of the bags to at least preserve the possibility of noting the presence of additional hairs or fibers that went unnoticed during their examination. Instead, they ruined any possible future examination by "fuming" the bags and did not maintain custody of the body parts. As a result, the defense has no way to advance any forensic claims in support of assessing responsibility for the murder to someone other than the defendant.

## Point V

The defendant Dmitriy Yakovelev hereby adopts the motions and arguments of his codefendant insofar as they are applicable to him.

## Point VI

The defendant Dmitriy Yakovlev respectfully reserves the right to timely file additional motions upon further disclosure of the discovery materials.

## Conclusion

For all the foregoing reasons, it is respectfully requested that the Court enter an order suppressing the evidence taken by the government in its search and seizure at 4614 Surf Avenue, Brooklyn New York and all evidence removed from the White Lexus registered to the defendant Dmitriy Yakovlev, or, in the alternative, for a hearing, and for an order denying the government's anticipated introduction of evidence taken from the body parts and/or bags containing the body parts, together with such other and further relief as this Court deems just and proper.

Dated:   New York, New York
         September 17, 2010.

                              Respectfully submitted,

                              MICHAEL H. GOLD
                              Attorney for Defendant
                              Dmitriy Yakovlev
                              350 Fifth Avenue, Suite 4400
                              New York, New York 10118
                              (212) 838-0699