FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JAN 24 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
UNITED STATES OF AMERICA,

Plaintiff,

-against-

DMITRIY YAKOVLEV, a/k/a
    "Dmitri Yakovlev,"
    "Dimitri Yakovlev" and
    "Dimitriy Yakovlev" and
JULIA YAKOVLEV, a/k/a
    "Ioulia Sotcilina,"
    "Julia Sotcilina" and
    "I. Sotcilina,"

             Defendants.
------------------------------------------------x

MEMORANDUM AND ORDER
09 CR 587(S-1) (ILG)

GLASSER, United States District Judge:

Pending before me is a Motion to Reconsider a Memorandum and Order (M&O) dated January 3, 2011, by which the Court denied a motion to suppress the search for and seizure of things that were not "the human remains of Jane Doe #1." Familiarity with that M&O is assumed. The denial of the motion was predicated upon the Court's determination that the "good faith" exception to the exclusionary rule was applicable. That determination was predicated in turn, upon the fact that Special Agent Alexey Abrahams was the affiant of the comprehensive affidavit in support of the search warrant and was also the Agent who executed the warrant. The significance of that fact was derived from the Court's reading of <u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 989 n.6 (1984), which was then set out, viz.:

> Normally when an officer who has not been involved in the application stage receives a warrant, he will read it in order to determine the object of the search. In this case, Detective O'Malley, the officer who directed the search, knew what items were listed in the affidavit presented to the judge, and

he had good reason to believe that the warrant authorized
the seizure of those items.

The first five paragraphs of Agent Abrahams affidavit recited that based upon his information and belief, there was probable cause that in the basement of 4614 Surf Avenue, Brooklyn, New York, there will be found evidence of the violation of 18 U.S.C. §§ 1028A(a)(1) and 1344, Aggravated Identity Theft and Bank Fraud, respectively, and 15 U.S.C. § 1644(a) Credit Card Fraud: The human remains of Jane Doe #1.

The search warrant described the property to be seized as "the human remains of Jane Doe #1, which consist of evidence of violations of the above enumerated crimes." Commenting upon the obvious fact that the human remains of Jane Doe would not consist of evidence of violations of those crimes and given the extensive recitation of the events alleged to be evidence of those crimes by Agent Abrahams in his affidavit, and the fact that he was the Agent who, together with others, executed the warrant, and my reading of Sheppard and United States v. Rosa, 626 F.3d 56 (2d Cir. 2010), I concluded that the good faith exception was applicable.[1] I arrived at the conclusion of Agent Abrahams' good faith despite the government's decision not to call him as a witness. Called instead was FBI Special Agent Tracie Razzagone who, together with Agent Abrahams, was one of the officers executing the search warrant. When asked "What did the search warrant authorize agents to search for?" she answered: "We were authorized

---

[1] I should note that I also cited United States v. George, 975 F.2d 72, 76 (2d Cir.) (M&O at 11), as warranting the same conclusion, albeit by implication, as was derived from Sheppard and Rosa. A closer reading of George reveals that he also was one of the officers executing the warrant and the good faith exception was held inapplicable. The implication drawn by me is, therefore, questionable. Patrolman Brickell was the affiant and one of the officers executing the warrant, 975 F.2d 74-5, and the good faith exception was held inapplicable.

to search for human remains belonging to Irina Melezhik" (Jane Doe #1) Tr. at 20-21.
The transcript of that proceeding also reflects the following:

> Q    At some point on that first day, did agents search the
>       filing cabinet?
>
> A    Yes, we did.
>
> Q    What were agents looking for in the filing cabinet?
>
> A    Again, we were looking for what was authorized to us
>       in the search warrant, which was the presence of
>       human remains. So that could include any blood
>       stained items, tissue, hair and fiber, teeth, bone, any
>       clothing that may have DNA samples on it. Anything
>       that would have the presence of bodily remains on
>       them.

Tr. at 34.

In a letter dated January 6, 2011, the government requested the Court "to clarify certain facts referenced in the Court's Memorandum and Order." It called my attention to Agent Razzagone's testimony, but of far greater significance, in a footnote, advised that FBI Special Agent Alexey Abrahams' understanding of the scope of the search warrant was consistent with that of Special Agent Razzagone.

That footnote sparked a letter by counsel for the defendant Dmitriy Yakovlev, dated January 10, 2011, which is regarded as a Motion to Reconsider my M&O of January 3, 2011.

At a conference on January 14th, at which the Court ruled on *in limine* motions relating to evidentiary matters, some discussion was had on the government's January 6th request for clarification alluded to above. In the course thereof, I made some observations about the "plain view" exception to the exclusionary rule which prompted a

3

letter from the government dated January 16th and received via fax as this was being written, and also recorded on the docket sheet as Docket No. 141.

## Discussion

I have, on more than one occasion, been prompted to recall and heed the admonition that Learned Hand once urged be written over the portals of every courthouse. It was Oliver Cromwell's plea to the Church of Scotland on the eve of the Battle of Dunbar: "I beseech ye in the bowels of Christ, think that ye may be mistaken." Dillard, the Sprit of Liberty XXIV (1952).

In obedience to that admonition, I have critically re-examined my M&O and the premises upon which its conclusions were reached. I re-visit, to begin with, pages 9 and 10 of that M&O which comment on the ambiguity of the search warrant. Having been satisfied by a comprehensive affidavit of the existence of probable cause, the magistrate judge authorized a search of the specifically described premises (the basement of 4614 Surf Avenue), where there is concealed "the human remains of Jane Doe #1, which consists of evidence of violation of . . . ." the statutes criminalizing aggravated identity theft, bank fraud and credit card fraud. As noted above, I made the observation that the human remains of Jane Doe #1 would not be evidence of either of those crimes and inferred that what was intended was authorization to search for Jane Doe's remains and evidence of those crimes. Curious, although admittedly belatedly, about that circumlocution, I examined the indictment filed on August 20, 2009, and found the defendants charged with fraudulently using and conspiring to fraudulently use the identification of another person in violation of 18 U.S.C. § § 1028(a)(7) and 1028(f). Although not specified in that indictment or in the search warrant, 1028(b)(3)(B)

4

provides for a sentence of imprisonment for up to 20 years if the crime described in § § 1028(a)(7) and(f) "is committed in connection with a crime of violence." The circumlocution of the search warrant, which was applied for and issued on August 11, 2009, becomes apparent. If the human remains of the person whose identity was fraudulently used were found and the defendants were convicted, the sentence for the crime charged would be significantly enhanced. The warrant did not, therefore, as the Court inferred, authorize a search for evidence of the crimes specified and charged in the indictment filed 9 days later, but for evidence that would have a bearing on the punishment for those crimes. That initial indictment was thereafter superseded twice, on March 4, 2010 and January 5, 2011. In each of those indictments Dmitriy Yakovlev is charged with committing the crime of fraudulently using the identification of Irina Malezhik in connection with a crime of violence, namely, the murder of Irina Malezhik, and referencing § 1028(b)(3)(B) explicitly.

Based upon the inference I drew of what was intended to be the scope of the search, I emphasized the warrant as authorizing a search for the person or **property** specified and the **property** being the objects of the specifically numbered crimes. The foregoing explication compels a confession of error and the conclusion that the warrant authorized the search and seizure of the human remains of Jane Doe #1 only. The Fourth Amendment commands that search warrants particularly describe persons or things to be seized was obeyed, it was "the human remains of Jane Doe #1." That Amendment also commands the warrant to particularly describe the place to be searched, to which I now turn.

The search warrants issued by the magistrate judges were informed by the

5

affidavits of FBI Special Agent Abrahams, dated August 11 and 21, 2009, who, upon information and belief, urged the existence of "probable cause to believe that located within THE PREMISES KNOWN AND DESCRIBED AS THE BASEMENT OF 4614 SURF AVENUE, BROOKLYN, NEW YORK (the 'SUBJECT PREMISES'), there will be the following items, which constitute evidence of the commission . . . ." of the specifically numbered crimes described in Titles 15 and 18 of the United States Code. (Aff. p. 1).

The relevant paragraphs of the Affidavit are then as follows:

4. For the reasons set forth below, probable cause exists to believe that the body of Jane Doe #1 is buried within or beneath the SUBJECT PREMISES. Because a search for the body will necessarily cause the destruction of the concrete floor within those premises, we intend to follow carefully delineated procedures.

5. I have spoken with Special Agent Michael Byrnes of the FBI, who has been specially trained in the detection and recovery of human remains, including remains concealed within substances such as hardened concrete. He has advised me of the existence of the below-described procedures, which we believe represent a measured and limited approach to discovery of the exact location of the human remains in question with the least amount of damage to the SUBJECT PREMISES.

6. First, trained FBI agents and employees will

conduct a visual search of the concrete floor of the SUBJECT PREMISES to determine whether the surface of the floor suffers from the type of damage associated with the presence of a rotting corpse within or beneath the concrete floor. For example, oily spots may demonstrate the escape of gases from the corpse. The decomposition of the body may also cause the concrete to collapse around the area of the corpse, causing the surface to crack or buckle. In addition, the existence of significant cracks and buckles may have been, over the years, subject to clear attempts to patch the concrete work to disguise any damage.

7.     Second, the FBI will employ a specially-trained canine, who can detect the scent of decomposed or decomposing human remains. As an initial step, agents will secure the SUBJECT PREMISES and allow a canine a cursory olfactory search of the SUBJECT PREMISES. Because concrete is a porous substance, the gases produced by the putrification of human remains may sometimes be detected through even a cursory sweep by the canine.

8.     Third, a specialist working with FBI agents may employ the use of a device such as "ground penetrating radar," which will penetrate the surface of the concrete floor with radio waves or similar technology. This equipment is

7

designed to reveal the presence of anomalies in the structure of the concrete, consistent with the presence of a body.

9. Fourth, the FBI's evidence response team, in coordination with private contractors, will use fiber optic cables in an effort to detect the presence of human remains in the concrete or earth below. In order to use such a device, the FBI's contractors will drill small holes through the concrete floor, each of which are one-to-two inches in diameter. Fiber optic cables with the ability to transmit the images of the surrounding concrete and soil are designed to allow investigators to view bones, tissue, remains, clothing and other evidence of human remains.

10. If investigators detect evidence consistent with human remains through one of the above-described techniques they will then demolish the concrete surrounding a targeted area of the floor. Thus, the execution of this warrant will be conducted in a measured and restrained way, preventing significant damage to the floor unless positive evidence is revealed through one of the above-described techniques.

\*   \*   \*

36. b. Not long after meeting DMITRIY YAKOVLEV ("Yakovlev"), John Doe #1 and Yakovlev discussed a project John Doe #1

intended to undertake in the basement of John Doe #1's residence, whereby John Doe #1 planned to increase the size of his basement by digging into his foundation and laying a new, lower, concrete floor. By doing so, John Doe #1 intended to increase the height of the ceiling in his basement from approximately seven feet to approximately nine feet. John Doe #1 - who is a professional carpenter - intended to do the work himself.

    c.   In September or October 2007, Yakovlev told John Doe #1 that he would like to do the same kind of reconstruction work on the basement in his residence at 4614 Surf Avenue, Brooklyn, New York (i.e., the "'SUBJECT PREMISES"), as John Doe #1 had previously described to Yakovlev. John Doe #1 explained to Yakovlev how the current concrete floor of the SUBJECT PREMISES should be dug up and replaced by new concrete. John Doe #1 explained to Yakovlev that in order to maintain the SUBJECT PREMISES's structural integrity, digging should be done only in small segments around the perimeter of the SUBJECT PREMISES, and that new concrete should be added as each segment is dug. Only after the new concrete is poured in a particular segment would a new section be dug. Yakovlev asked John Doe #1 if he could borrow John Doe's cement mixer for use during the project. John Doe #1 agreed to provide him with his cement mixer, and offered his assistance. Yakovlev said he wanted to do the project

9

himself.

       d.    Several days after Yakovlev's request, Yakovlev appeared at John Doe #1's residence asking for the cement mixer, which comprises a barrel approximately 30 inches wide and 28 inches tall and 28 inches deep that sits on a stand. The cement mixer operates by being plugged into an electrical socket and weighs approximately 80 pounds. John Doe #1 also offered to assist Yakovlev in transporting the cement mixer to the SUBJECT PREMISES, but Yakovlev declined. That day, Yakovlev pushed the cement mixer from John Doe #1's residence towards Yakovlev's residence at 4614 Surf Avenue, Brooklyn, New York.

       e.    Over the course of weeks after taking the cement mixer from John Doe #1, DMITRIY YAKOVLEV asked John Doe #1 numerous questions about the reconstruction project at the SUBJECT PREMISES, including questions about properly mixing cement as well as questions about digging around the SUBJECT PREMISES's perimeter. Yakovlev told John Doe #1 that he had never worked with cement before. John Doe #1 asked Yakovlev on a number of occasions whether he could assist Yakovlev at the SUBJECT PREMISES, but Yakovlev repeatedly declined.

       f.    Approximately eight months after DMITRIY

YAKOVLEV borrowed the cement mixer, Yakovlev brought the cement mixer back to John Doe #1's residence.

g. Approximately five weeks prior to Yakovlev's arrest on July 24, 2009, Yakovlev advised John Doe #1 that he intended to enter the next stage of reconstructing the SUBJECT PREMISES. Yakovlev had completed digging and refilling around the perimeter of the SUBJECT PREMISES and now needed to work on the remainder of the SUBJECT PREMISES. Yakovlev asked for John Doe #1's assistance. The project would entail removing the concrete from the middle of the floor of the SUBJECT PREMISES as well as the sand, dirt and debris unearthed from digging around the perimeter of the SUBJECT PREMISES. JOHN Doe #1 agreed to work with Yakovlev at the SUBJECT PREMISES to complete the project, in exchange for payment of $200 each day.

h. Approximately five weeks before Yakovlev's arrest, John Doe #1 entered the SUBJECT PREMISES. Inside of the SUBJECT PREMISES, John Doe #1 observed that a significantly large amount of sand and dirt had been removed from the areas around the perimeter of the SUBJECT PREMISES. Based on his observation of the amount of sand and dirt dug up, and his experience in

construction, John Doe #1 surmised that the perimeter area had been dug deeper and wider than necessary and than that he had told Yakovlev to remove. Yakovlev informed John Doe #1 that Yakovlev had done all the work in the SUBJECT PREMISES himself.

i. When John Doe #1 entered the SUBJECT PREMISES, John doe #1 detected a strong, foul odor emanating from the SUBJECT PREMISES. Yakovlev told John Doe #1 that the smell was a result of his dog defecating and urinating in the basement. Yakovlev explained to John Doe #1 that he had had the dog euthanized by a veterinarian.

j. John Doe #1 began working at the SUBJECT PREMISES soon afterwards. The strong, foul odor emanating from the SUBJECT PREMISES persisted, although it became less strong as the sand and dirt in the SUBJECT PREMISES had been removed. By the time of Yakovlev's arrest, most of the sand and dirt and additional concrete had been removed from the floor of the SUBJECT PREMISES. John Doe #1 did not observe any trace of excrement or urine while working in the SUBJECT PREMISES.

k. While working at the SUBJECT PREMISES, John Doe #1 and Yakovlev were often assisted by one or two day laborers. On one occasion, one of the laborers became faint,

and John Doe #1 joked that if he were to die while working, they could bury him in the new concrete floor of the SUBJECT PREMISES. While John Doe #1 intended his comment to be taken lightly, Yakovlev stared at John Doe #1 and did not laugh.

37. I have been advised by Special Agent Byrnes that a corpse that had been buried in or underneath concrete would likely decay at a slower pace than a body buried in dirt, and may continue to emit an odor two or more years after its burial.

Aff. of August 11, 2009.

On August 21, 2009, Agent Abrahams submitted another affidavit in support of an application to extend the period of the search. In that affidavit he stated:

2. Subsequently, on August 17, 2009, the FBI agents commenced a search of THE PREMISES KNOWN AND DESCRIBED AS THE BASEMENT OF 4614 SURF AVENUE, BROOKLYN, NEW YORK. However, due to an engineering assessment of the structural condition of the SUBJECT PREMISES, substantial structural reinforcement has been deemed appropriate prior to initiation of the main search effort. As a result, the FBI has not been able to complete the search within the ten-day period specified by the original warrant.

Aff. of August 21, 2009.

A hearing was held on October 22, 2010, on the motion to suppress. As has been noted, called by the government in opposition to the motion was FBI Special Agent Tracie Razzagone, who, when asked:

> Q    Did the search warrant apply to a particular location
>      at 4614 Surf Avenue?
>
> A    Yes, it did.
>
> Q    What location?
>
> A    The basement of the residence.
>
> Q    What did the search warrant authorize agents to
>      search?
>
> A    We were authorized to search for human remains belonging
>      to Irina Malezhik.

Tr. at 20-21.

The foregoing paragraphs can only be read as "particularly describing the place to be searched" in obedience to the Fourth Amendment's command, namely, the basement floor that was to be dug up in the belief that the human remains of Jane Doe #1 would be found buried there.

The government urges denial of the motion to suppress relying on two sentences in United States v. Ross, 456 U.S. 798 (1982), the "plain view" and "good faith" exceptions to the exclusionary rule. The sentences in Ross from which the government seeks solace are: "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that

separate acts of entry or opening may be required to complete the search. Thus a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, drawers and containers in which the weapon might be found." 456 U.S. at 820. The issue in <u>Ross</u> is the scope of a warrantless search of an automobile. After an extensive discussion of the prior cases on that issue, the Court held that "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." 456 U.S. at 825. The fleeting observation on the scope of an authorized search of a home was clearly dictum and in the context of this case, inapposite.

If <u>Ross</u> is advanced as authority for the agents' entry into the boiler room and the applicability of the plain view exception to the exclusionary rule to what they did there, it fares no better.

Although my view that the place to be searched was particularly described in the affidavit as bounded by that area of the basement's concrete floor under which Jane Doe #1 was believed to be buried, and the affidavit having been read by the agents, the bounds of that place was or should have been known to them, the warrant did not describe the place with that meticulous particularity. It simply authorized a search of the "Basement" of the subject premises without elaboration. The operative document, however, was the warrant, not the affidavit, and assuming that the entry simpliciter, beyond that area into the boiler room was authorized, it has no legal significance for the lawfulness of what was searched and seized there. The government urges that the "plain view" doctrine stamps with approval the search of the filing cabinet, the seizure of its contents and the woman's panties from the floor of the boiler room.

Surely most cited on the "plain view" doctrine is <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 466-71 (1979). The prerequisite for the application of that doctrine stated by M. Justice Stewart are (1) that a lawful search must be in progress at the time; (2) that the discovery of the evidence must be inadvertent[2]; and (3) only where it is immediately apparent to the police that they have evidence before them. <u>Horton v. California</u>, 496 U.S. 128, 136 (1990) (The plain view doctrine is legitimate only when it is immediately apparent to the police that they have evidence before them). In <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987), the Court added an important gloss on the doctrine, namely, that probable cause is required to invoke the plain view doctrine. That is to say, probable cause to believe that what is seized has evidentiary value, is evidence of a crime. "Indeed, to treat searches more liberally would especially erode the plurality's warning in <u>Coolidge</u> that the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." A proliferation of citations on the "immediately apparent" requirement would be an affectation of research.

It is important to keep in mind the theoretical underpinning of the plain view exception to the exclusionary rule. It was explained by the Court in <u>Coolidge</u> as follows, on p. 467-68:

> The rationale for the 'plain view' exception is evident if we keep in mind the two distinct constitutional protections served by the warrant requirement. First, the Magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause . . . The second, distinct objective is

---

[2] "The absence of inadvertence was deemed not essential to the plain view argument." <u>Horton v. California</u>, 496 U.S. 128, 137 (1990).

that those searches deemed necessary should be as limited as possible. Here, the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings . . . The warrant accomplishes this second objective by requiring a 'particular description' of the things to be seized . . . [a]n object in plain view is consistent with the second objective since it does not convert the search into a general or exploratory one. As against the minor peril to Fourth Amendment protections, there is a major gain in effective law enforcement. Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous - to the evidence or to the police themselves - to require them to ignore it until they have obtained a warrant particularly describing it.

The rationale for searching the filing cabinet and seizing its contents is sadly absent. There was no danger to preservation of evidence that may have been contained in the filing cabinet and surely a claim would not be made that it would be more inconvenient for the agents to obtain a warrant to avoid the evil of an exploratory rummaging through the defendants' property than it was to obtain a warrant to extend the duration of the search. See also Arizona v. Hicks, *supra,* at 327-28 "[t]he Warrant Clause embodies our government's historical commitment to bearing the burden of inconvenience." Texas v. Brown, 460 U.S. 730, 750 (1983) (Justice Stevens concurring)[3]

---

[3] Justice Stevens' observations in this regard are exquisitely apt: If a movable container is in plain view, seizure does not implicate any privacy interests. Therefore, if there is probable cause to believe it contains contraband, the owner's possessory interest in the container must yield to society's interest in making sure that the contraband does not vanish during the time it would take to obtain a warrant. The item maybe seized temporarily. It does not follow, however, that the container may be opened on the spot. Once the container is in custody, there is no risk that evidence will be destroyed. Some inconvenience to the officer is entailed by requiring him to obtain a warrant before opening the container, but that alone does not excuse the duty to go before a neutral magistrate.

The failure of the rationale that would justify the invocation of the doctrine would be enough to reject its application. The essential prerequisite for searching the filing cabinet and seizing its contents could not be satisfied. There was no probable cause to believe that the filing cabinet contained the human remains of Jane Doe #1 and probable cause is required in order to invoke the plain view doctrine. A reasonable suspicion is not enough. Arizona v. Hicks, *supra,* at 326. The doctrine cannot be invoked because it was not immediately apparent that they had evidence before them. Coolidge, *supra*, at 466. The contents of the filing cabinet, in any event, would not pass the plain view threshold. There is nothing uncommon or unusual about the presence of tools in a basement whether kept in a file cabinet or on an organized workbench. It is not immediately apparent that they have any evidentiary value. They were not human remains. Speculations about whether they could be or were used for some nefarious purpose won't do. The keys which were also contained in the file cabinet must similarly be suppressed because it was not immediately apparent at the time that they had evidentiary value. It wasn't until sometime thereafter that one of the keys was found to have evidentiary value in connection with another aspect of the ongoing investigation. See United States v. Cellitti, 387 F.3d 618 (7th Cir. 2004). The same conclusion is compelled as regards the envelope which was opened and the contents revealed. Neither the tools, the keys nor the envelope and its contents were items particularly described in the search warrant, nor did they have any immediately apparent evidentiary value.

The woman's panties found on the floor of the boiler room near the filing cabinet and one of the water heaters, Tr. at 32, requires a more extended discussion. Not being human remains in and of itself and, therefore, not being a thing particularly described in

the warrant, its seizure would require its exclusion as violative of the Fourth Amendment unless an exception to the exclusionary rule would validate it. The plain view exception would not apply and would not preclude its suppression for the reason that it was not immediately apparent <u>at the time</u> the panties were seized that it had evidentiary value. <u>Coolidge</u> taught that the plain view exception to the exclusionary rule is justified "only when it is immediately apparent to the police that they have evidence <u>before them</u>" (emphasis mine) and, as has already been noted, added that the "plain view doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." 403 U.S. at 466. That Justice Stevens, writing for the court meant the words "before them" to mean "at the time" of seizure is made manifest by the citation to his concurring opinion in <u>Stanley v. Georgia</u>, 394 U.S. 557, 569-72 (1969). There, in the course of executing a warrant authorizing a search of the defendant's home for "equipment, records, and other material used in or derived from an illegal wagering business," in a drawer of a desk the agents found not gambling material, but moving picture films the warrant gave them no authority to seize. The contents of the film were not readily apparent. After exhibiting them for approximately 50 minutes after finding them, they determined that the films were obscene. They arrested the defendant and charged him with possessing obscene matter. Justice Stewart, although concurring in the result, wrote: "For what happened here was that a search that began as perfectly lawful became an occasion for an unwarranted and unconstitutional seizure of the films." 394 U.S. 570. Some 14 years later, Justice Stevens, concurring again in <u>Texas v. Brown</u>, 460 U.S. 730, 748-49 (1983), confirmed that meaning explicitly, writing: [t]wo of the core requirements of plain view: seizing the

19

item must entail no significant additional invasion of privacy, and <u>at the time of seizure</u> the officer must have probable cause to connect the item with criminal behavior." (emphasis added).

The applicability of <u>Stanley</u> to this case is evident. At the time of seizure, Agent Razzagone did not have probable cause to connect the panties with criminal behavior. Julia Yakovlev lived in that house and the panties could have been hers or those of any other woman who ever lived in or visited that house. The agent's speculation that it might have been Jane Doe #1's is not enough. See <u>Sherouse v. Ratchner</u>, 573 F.3d 1055, 1062 (10th Cir. 2009). Suspicion is not enough. <u>Arizona v. Hicks</u>, *supra*, at 326; <u>United States v. Gonzalez</u>, 334 F. Supp.2d 275 (E.D.N.Y. 2004). Information of a DNA match was learned later, after laboratory tests of the panties reported DNA findings. A perfectly clear illustration of "at the time of seizure" limitation on the doctrine is <u>United States v. Gray</u>, 484 F.2d 352 (6th Cir. 1973). In that case, in the course of executing a warrant describing the property to be seized as "any intoxicating liquors or materials used in the manufacture of intoxicating liquors," the officer found two rifles. He copied down the serial numbers of the weapons and subsequently ran them through the computer of the National Crime Information Center and learned for the first time that the weapons were stolen. The Court held that the plain view doctrine was not applicable because it was not immediately apparent to the officer who, at that time, had no knowledge that the rifles were evidence of any other crimes. See also <u>United States v. McLevain</u>, 310 F.3d 434 (6th Cir. 2002); <u>Doane v. United States</u>, 2009 WL 1619642 (S.D.N.Y. 2009).

Given that the seizure of the panties was not authorized by a particularized

description of them in the warrant and the inapplicability to that seizure of the plain view doctrine, it does not necessarily follow that the panties should be suppressed if the seizure was justified by the good faith exception to the exclusionary rule. For the reasons that follow, I conclude that "in the Fourth Amendment context, the exclusionary rule can be modified somewhat without jeopardizing its ability to perform its intended functions." United States v. Leon, 468 U.S. 897, 905 (1984).

Leon teaches that "Whether the exclusionary sanction is appropriately imposed in a particular case . . . must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective." 468 U.S. at 906-07.

The comprehensive, detailed, 24 page affidavit presented to the magistrate judges in support of the applications for a search warrant and for an extension thereof, can raise no serious doubt that there was ample probable cause for the issuance of the warrants. The place to be searched was described with sufficient particularity. The thing to be searched for and seized was described as "the human remains of Jane Doe #1." That description, in the context of the entire affidavit, which conveyed the belief that Jane Doe #1 was buried beneath the concrete floor of a basement, was sufficiently descriptive. Hindsight would suggest that it would have been better had the warrant been more expansive as, e.g., by adding after Basement . . . "and any box, container, receptacle or cabinet found there."

The determinative inquiry is whether Agent Razzagone's seizure of the underpants was in the objectively reasonable belief that her conduct did not violate the

Fourth Amendment and was authorized by the warrant. The Court is driven to conclude that her conduct was objectively reasonable and that her action was pursued in good faith. That conclusion is based upon relevant portions of her testimony at the hearing on the motion to suppress on October 22, 2010. At the very outset of her cross-examination, the transcript reflects the following:

> Q    Agent, when you and your fellow agents went to the residence on August 17th, 2009, had you reviewed the affidavit in support of the search warrant?
>
> A    Yes, I did.
>
> Q    You indicated you had spoken with fellow agents in connection with the course of the investigation to familiarize yourself with the status of the case, is that correct?
>
> A    Yes.
>
> Q    The search warrant, to your knowledge, authorized the search for the human remains of Irina Malezhik, is that correct?
>
> A    Evidence of human remains, yes.

Tr. at 49.

It is important to note, that she testified she reviewed paragraph 9 of the affidavit which explicitly referenced "bones, tissue, remains, <u>clothing and other evidence of human remains</u>," when she went to the subject premises. (emphasis added).

That Agent Razzagone had, indeed, reviewed the affidavit is confirmed by the

following brief excerpt of her direct examination:

> Q   At some point on that first day, did agents search the
>     filing cabinet?
>
> A   Yes, we did.
>
> Q   What were agents looking for in the filing cabinet?
>
> A   Again, we were looking <u>for what was authorized to us</u>
>     <u>in the search warrant</u>, which was the presence of
>     human remains. So that could include any blood
>     stained items, tissue, hair and fiber, teeth, bone, any
>     clothing that may have DNA samples on it. Anything
>     that would have the presence of bodily remains on
>     them. (emphasis added).

Tr. at 34.

The foregoing makes Justice White's statement in <u>Leon</u> precisely apposite:

> In short, where the officer's conduct is objectively reasonable
> 'excluding the evidence will not further the ends of the
> exclusionary rule in any appreciable way; for it is painfully
> appropriate that . . . the officer is acting as a reasonable
> officer would and should act in similar circumstances.
> Excluding the evidence can in no way affect his future
> conduct unless it is to make him less willing to do his duty.
> (citations omitted).

468 U.S. at 920.

The discussion of the plain view and good faith exceptions to the exclusionary

rule is relevant and applicable to the seizure of the cardboard box to which the canine

alerted positively, see, e.g., Affidavit paragraph 7. The fact that the Russian newspaper was read to note the date on it does not negate the immediately apparent prerequisite of the plain view doctrine. See United States v. Ochs, 595 F.2d 1247 (2d Cir. 1979) (Friendly, J.) The exclusionary rule exceptions validated the search and seizure. The relevance of the evidence from that box, if any, will await the trial.

The motion to suppress the seizure of the Franck Muller watch catalogue is denied. The agents were on the second floor of the residence lawfully at the request, if not the consent of Julia Yakovlev. The agents had probable cause to believe its nexus to the crime it was investigating and its evidentiary value was immediately apparent. See Andresen v. Maryland, 427 U.S. 463, 483 (1976).

In sum, the motion to reconsider the M&O of January 3, 2011, is granted. Reconsideration having been given, the January 3rd M&O is withdrawn and the defendants' motion to suppress the search and seizure of the file cabinet and its contents is granted. The motion to suppress the woman's underpants and the Russian newspaper in the cardboard box is denied, as is the motion to suppress the Franck Muller watch catalogue. The motion to declare the search warrant invalid for the want of probable cause to support it is also denied.

SO ORDERED.

Dated:     Brooklyn, New York
           January 21, 2011

                                        S/
                                  I. Leo Glasser