JDG/AH
F.#2009R01500

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                09 CR 587 (S-2)(ILG)

DMITRIY YAKOVLEV,
    also known as
    "Dmitri Yakovlev,"
    "Dimitri Yakovlev," and
    "Dimitriy Yakovlev,"

              Defendant.

- - - - - - - - - - - - - - - X


THE GOVERNMENT'S MEMORANDUM OF LAW IN
OPPOSITION TO THE DEFENDANT'S POST-TRIAL MOTIONS


                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


James D. Gatta
Amanda Hector
Assistant U.S. Attorneys
    (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in opposition to the defendant Dmitriy Yakovlev's post-trial motions, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, for judgments of acquittal on each of the fifteen counts of conviction, or alternatively, for a new trial. (<u>See</u> Ltr. from Michael H. Gold, Esq., to the Court, dated March 10, 2011 (Docket No. 176) ("Def.'s Ltr.")).

The defendant argues that the evidence presented at trial was insufficient to support his conviction on the challenged counts.  For the reasons set forth below, the defendant's motions should be denied in all respects.

<u>STATEMENT OF FACTS</u>

I.   <u>Introduction</u>

On March 3, 2011, Dmitriy Yakovlev was convicted, following a jury trial, of all fifteen counts of a second superseding indictment ("Indictment") charging him with a variety of crimes stemming from his use of the identities of three persons – Michael Klein, Viktor Alekseyev and Irina Malezhik – immediately following each of their disappearances, and with murdering Alekseyev and Malezhik in connection with Yakovlev's use of Alekseyev and Malezhik's identities.  Yakovlev was convicted of: conspiring to commit and committing bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349 (Counts One (Bank Fraud Conspiracy – Michael Klein), Two (Bank Fraud – Michael Klein), Five (Bank Fraud – Viktor Alekseyev), Eleven (Bank Fraud Conspiracy – Irina Malezhik) and Twelve (Bank Fraud – Irina Malezhik)); conspiring to use, and the use of, unauthorized access devices and conspiring to effect, and effecting, fraudulent transactions, in violation of 18 U.S.C. §§ 1029(a)(2), 1029(a)(5) and 1029(b)(2) (Counts Three (Use of Unauthorized Access Devices – Viktor Alekseyev), Four (Effecting Fraudulent Transactions – Viktor Alekseyev), Eight (Conspiracy to Use Unauthorized Access Devices and Effect Fraudulent Transactions – Irina Malezhik), Nine (Use of Unauthorized Access Devices – Irina Malezhik), and Ten (Effecting Fraudulent Transactions – Irina

3

Malezhik)); conspiring to fraudulently use, and fraudulently using, a means of identification of another, in violation of 18 U.S.C. §§ 1028(a)(7) and 1028(f) (Counts Six (Fraudulent Use of Identification – Viktor Alekseyev), Thirteen (Conspiracy to Fraudulently Use Identification – Irina Malezhik) and Fourteen (Fraudulent Use of Identification – Irina Malezhik)); and aggravated identity theft , in violation of 18 U.S.C. 1028A(a)(1) (Counts Seven (Aggravated Identity Theft – Viktor Alekseyev) and Fifteen (Aggravated Identity Theft – Irina Malezhik)).

Moreover, Yakovlev was convicted of committing the crimes charged in Counts Six, Thirteen and Fourteen – the fraudulent use of, and the conspiracy to fraudulently use, means of identification of Viktor Alekseyev and Irina Malezhik – in connection with the murder of Alekseyev and the murder of Malezhik, in violation of 18 U.S.C. § 1028(b)(3)(B).

The evidence presented at trial convincingly demonstrated Yakovlev's participation in the crimes of which he was convicted and established the following facts.

II.   The Disappearance of Michael Klein
      and Fraud Utilizing Klein's Identity

      A.   Michael Klein's Disappearance

In 2003, Michael Klein, a New York City Police Department mechanic, agreed to sell a residential property located at 4120 Manhattan Avenue, in the Sea Gate community of Brooklyn, New York ("4120 Manhattan Avenue") to Aleksander

4

Hamilton.  (<u>See</u> Tr. 940-41, 951).[1]  Klein told Hamilton that he intended to reside with his girlfriend in Long Island following his sale of 4120 Manhattan Avenue.  (Tr. 949-50).  Hamilton and his wife Lyudmila Basalyga were friends with the defendant Dmitriy Yakovlev and his wife, Julia Yakovlev.[2]  Hamilton and Basalyga met Dmitriy and Julia Yakovlev in or about 2000, when they rented an apartment in Brooklyn from the Yakovlevs.[3]  (Tr. 926-28).  The couples remained friendly after Hamilton and Basalyga moved out of the apartment they rented from the Yakovlevs in 2001, when the Yakovlevs moved to Sea Gate.  (<u>See</u> Tr. 934).  After Hamilton agreed with Klein to purchase 4120 Manhattan Avenue, and prior to the sale of the property, Yakovlev asked Hamilton if the defendant's name could be added to the deed to 4120 Manhattan Avenue along with Hamilton's and Hamilton agreed.  (Tr. 951-52).  Hamilton understood that the defendant had recently sold a property and wanted to invest in another property "for tax purposes."  (Tr. 951-952).  Later, the

---

[1]    Citations to "Tr." refer to the trial transcript in <u>United States v. Dmitriy Yakovlev</u>, 09 CR 587 (ILG).  Citations to "GX" refer to government exhibits admitted at trial.

[2]    In 2010, Hamilton changed his name from Aleksander Basalyga to Aleksander Hamilton.  (Tr. 925-996).

[3]    The Yakovlevs, Hamilton and Basalyga socialized and traveled together.  (Tr. 928).  On one occasion, in 2001-02, the couples spent time together in a large park in New Jersey.  (Tr. 929-930).  Hamilton recalled that Julia Yakovlev used to live near the park.  (Tr. 930).

defendant and Hamilton agreed that Julia Yakovlev's name would be added to the deed rather than the defendant's due to, as the defendant explained it to Hamilton, the defendant's "bad credit history." (Tr. 953-954). Hamilton understood that the arrangement was to be temporary and that Julia Yakovlev's name would be removed from the deed at some point following the sale. (Tr. 1002).

The closing regarding the sale of 4120 Manhattan Avenue took place on November 26, 2003 at the Brooklyn offices of Klein's attorney, Ari Neuberger. (Tr. 952-953, 1021-1022). At the closing, Klein received four checks: a check for $348,519 drawn on a Bank of New York mortgage disbursement account (Tr. 1023-1024; GX 116, 119, 119a); a JPMorgan Chase bank check for $7,000 purchased by Hamilton (Tr. 956-57, 1023-24; GX 115); a Citibank bank check for $13,000 purchased by the defendant (See Tr. 1024; GX 117); and a check for $12,866.50 drawn on Neuberger's IOLA account at JPMorgan Chase (Tr. 1025-1026; GX 117). The defendant did not attend the closing. Instead, the defendant told Hamilton that he would stay at 4120 Manhattan Avenue to prevent people from "moving in" to the property while the closing was taking place. (Tr. 954; see Tr. 1045 (Julia Yakovlev explained to Lyudmila Basalyga that the defendant would stay by 4120 Manhattan Avenue "to see that nothing . . . [would] happen during the closing")). Lyudmila Basalyga did not attend

the closing for 4120 Manhattan Avenue, either.  On the morning of the closing, Julia Yakovlev asked Basalyga to watch the Yakovlev's infant daughter.  (Tr. 955, 1044-1045).  Accordingly, Basalyga stayed at her and Hamilton's apartment on Brightwater Avenue in Brooklyn with the Yakovlevs' child during the closing. (Tr. 1045).

Hamilton and Klein had agreed that they would meet at 4120 Manhattan following the closing so that Klein could, among other things, hand over the keys to the house to Hamilton.  (Tr. 963).  When the closing ended, Hamilton, Julia Yakovlev and Klein left Neuberger's office at approximately the same time.  (Tr. 962).  Hamilton went to pick up Lyudmila Basalyga at their apartment before going to 4120 Manhattan Avenue.  (See Tr. 963). Julia Yakovlev, however, did not come to pick up her and the defendant's child for more than an hour, delaying Hamilton and Basalyga.  (Tr. 963).  When Hamilton and Basalyga arrived at 4120 Manhattan Avenue, Klein was not there.  (Tr. 966-967).  Hamilton called Klein, but he did not reach him.  (Tr. 966-967).  Hamilton called the defendant, who said that he had been at the property and had seen Klein enter the house and then drive away in a car. (Tr. 968).  Later that evening, Hamilton drove by 4120 Manhattan Avenue again, but did not see any sign of Klein.  (Tr. 968-969).

The next day, Hamilton went back to 4120 Manhattan Avenue, and found the defendant inside holding a set of keys.

(Tr. 969).   The defendant told Hamilton that he had pushed open a window to gain entrance and had found the keys on a kitchen table.  (Tr. 970).   The defendant suggested that Klein, who had just come into "a lot of money," probably had gone to Florida to "live his life."  (Tr. 971).   Sometime shortly thereafter, Klein's girlfriend Janet Chase came to 4120 Manhattan Avenue looking for Klein.  (Tr. 971-972).   The defendant repeated to Chase his suggestion that Klein had left because he had come into some money.  (Tr. 973).

The defendant and Hamilton cleaned apartments within 4120 Manhattan Avenue that contained Klein's belongings.[4] (Tr. 974).  Within an apartment that Klein had occupied prior to the sale of the property, Hamilton found that "[e]verything was still there the same way as it was before"; Klein had left "clothing, keys, everything, toothpaste, toothbrush, everything." (Tr. 975-976).   Lyudmila Basalyga also observed that Klein left "all his personal belongings."  (Tr. 1024).

In late December 2003, Hamilton and Basalyga moved into 4120 Manhattan Avenue, into a first floor apartment that had been occupied by Klein.  (Tr. 980-981).  Before the couple moved in, the defendant hired someone to renovate the apartment's bathroom, including tiling the floor and walls, installing a new toilet and

---

[4]     Other apartments within 4120 Manhattan Avenue were occupied by tenants.  (Tr. 947).

8

glazing the bathtub, as a "gift."  (Tr. 981-983).  Sometime in
approximately January 2004, Yakovlev showed Hamilton the $7,000
bank check payable to Klein that Hamilton had brought to the
closing on 4120 Manhattan Avenue and the defendant asked Hamilton
to cash the check.[5]  (Tr. 976-977).  The next day, Hamilton asked
the defendant how he had the check.  (Tr. 977).  The defendant
told Hamilton that on the day of the closing, Yakovlev saw Klein
leaving 4120 Manhattan Avenue and chased after Klein.  (Tr. 977).
Yakovlev told Hamilton that Klein rolled the window of his car
down and handed Yakovlev the $7,000 check and said "give it to
Alex or this is Alex's check."  (Tr. 977).  Hamilton kept the
check and deposited it.  (Tr. 978).

     In January 2004, Yakovlev showed Hamilton a variety of
documents belonging to Klein, including Klein's credit cards.
(Tr. 984).  The defendant told Hamilton that he knew "everything
about Michael [Klein], all the financial information, all the
personal information, mother's names and date of birth and Social
Security and his father's data."  (Tr. 984).  The defendant asked
Hamilton – whom the defendant knew was a computer programmer –
"to get involved in stealing money" from Klein's accounts.  (Tr.
984).  Hamilton refused.  (Tr. 984).  Later that month, Yakovlev
told Hamilton that if Hamilton did not pay Yakovlev $100,000,

---

[5]     Yakovlev told Hamilton that Yakovlev's tenant had tried
to cash the check earlier, but was unable to.  (Tr. 978-979).

Julia Yakovlev would not "get off the deed" to 4120 Manhattan Avenue.  (Tr. 985-986).

B.   <u>The Discovery of Klein's Abandoned Car</u>

On November 28, 2003, two days after Klein's disappearance, a Chevrolet Nova automobile registered in the name of Klein was found abandoned, with no license plates, in an industrial area of Irvington, New Jersey.  (Tr. 908-11, 916; GX 122).  The car was found approximately two miles from the Ivy Hill residential apartment complex where the defendant and Julia Yakovlev lived in the late 1990s.  (Tr. 930, 1255-59; GX 260).  No one attempted to claim the car and it was subsequently destroyed.  (<u>See</u> GX 122a-b).

C.   <u>The Defendant's Use of Klein's Identity to Commit Fraud</u>

On December 4, 2003, the $13,000 Citibank bank check made payable to Klein and given to Klein at the closing on 4120 Manhattan Avenue was deposited into a joint bank account at Citibank in the name of the defendant and Julia Yakovlev (the "Yakovlev Citibank Account").  (Tr. 707-08, 1024; GX 117, 606).  The back of the check contained a double-endorsement; under the handwritten "pay to the order of Dmitriy Yakovlev" was purportedly the signature of Michael Klein as well as the defendant's signature.  (Tr. 707-08; GX 117, 606, 611).  On December 17, 2003, the $12,866.50 check made payable to Klein from Neuberger's IOLA account and given to Klein at the closing

10

was deposited into the Yakovlev Citibank Account.  (Tr. 709-10, 1025-26, GX 117, 606).  That check was also double-endorsed in the same manner as the $13,000 check.  (Tr. 709-10, GX 117, 606, 611).

In February 2004, a Washington Mutual bank account was opened in the name of Michael Klein (the "Washington Mutual Account").  Records revealed that the Washington Mutual Account was opened either on-line or by telephone, and the address associated with the account was located in Cape Coral, Florida. (Tr. 1062-63; GX 119, 119a).  Weeks later, in April 2004, the $348,519 check paid to Klein at the closing on 4120 Manhattan Avenue – drawn on the Bank of New York mortgage disbursement account – was deposited into the Washington Mutual Account at a Washington Mutual automated teller machine ("ATM") location on Brighton Beach Avenue in Brooklyn.  (Tr. 1064-65; GX 116, 119, 606).  The rear of the check contains a signature purportedly of Michael Klein, under a thick black line handwritten above the endorsement.  (Tr. 712; GX 116, 606).

The Washington Mutual Account was set up by Sergey Avtushko, a computer programmer and friend of the defendant's, at Dmitriy Yakovlev's direction.  Sometime in late 2003 or early 2004, the defendant asked Avtushko whether Avtushko would be able to open a bank account on-line for another person, an "old crazy guy" and "client[]" of the defendant's who the defendant claimed

11

did not know how to use a computer.[6] (Tr. 1092-1097). The defendant provided Avtushko with identification documents of Michael Klein, such as a copy of a driver's license and his Social Security number, that Avtushko used to establish the Washington Mutual Account. (Tr. 1094-97). Yakovlev also provided Avtushko with a cellular telephone and telephone number to use exclusively for the Washington Mutual Account (the "Fraud Phone"). (Tr. 1099).

Yakovlev also told Avtushko that the address connected to the account had to be from outside New York and asked Avtushko if Avtushko knew of someone whose address could be used. (Tr. 1097). Avtushko's friend Andrey Chernov, who lived with his parents in Florida, agreed that the defendant and Avtushko could use his parents' address. (Tr. 1098-99). Chernov also agreed to send any documents related to the Washington Mutual Account sent to his parents' address to Yakovlev in New York. (Tr. 1101-02). Avtushko arranged for the defendant and Chernov to get in contact with each other. (Tr. 1102). Avtushko learned later that Chernov had, in fact, sent such documents to Yakovlev. (Tr. 1102).

Over several months in 2004, the defendant and Avtushko contacted Washington Mutual bank regarding the account they had

---

[6]     Avtushko understood from Yakovlev that Yakovlev earned a living from real estate transactions.  (Tr. 1090).

established in Klein's name, first to verify account information
and then additional times to address "problem[s]" with the
Washington Mutual Account. (Tr. 1100-09). Each time, the
defendant and Avtushko called from the parking lot of a Brooklyn
shopping center in the defendant's burgundy Ford Expedition
sports-utility vehicle ("Ford Expedition"), using the Fraud
Phone. (Tr. 1100, 1103-05). On one occasion, the defendant
directed Avtushko to contact Washington Mutual because the
defendant had desposited a check into the Washington Mutual
Account and there was a "zero missing" from the total amount in
the account, which Avtushko understood should have been
approximately $320,000. (Tr. 1102-04). This discrepancy was
ultimately resolved. (Tr. 1104). Weeks later, the defendant
directed Avtushko to contact the bank because the defendant was
not able to withdraw the funds in the account. (Tr. 1105). When
Washington Mutual required that "Michael Klein" present himself
at a Florida branch, Yakovlev asked Avtushko whether Avtushko or
Chernov knew someone who would be willing to go to into the bank
pretending to be Klein. (Tr. 1106-07). Avtushko put Yakovlev in
touch with Chernov. (Tr. 1107). The defendant suggested to
Avtushko that if they were successful in obtaining access to the
funds in the Washington Mutual Account, Avtushko and Chernov
would be paid by the defendant. (See Tr. 1108, 1165). Chernov
later told Avtushko that a man Chernov knew attempted to enter a
Florida bank branch as Klein while Chernov waited outside, but

13

was arrested.  (Tr. 1108).  Avtushko relayed this information to the defendant.  (Tr. 1108-09).  Avtushko moved from New York to Florida in August 2004, and returned the Fraud Phone to the defendant around that time, possibly earlier.  (Tr. 1109).

        Washington Mutual records revealed that during 2004, the bank had communicated on a number of occasions with a person or person(s) claiming to be Michael Klein and seeking access to the funds in the Washington Mutual Account, but the bank froze the funds, deeming the customer requests suspicious.[7]  (Tr. 1076; GX 120).  Telephone records showed that around the times that the Fraud Phone was used to contact Washington Mutual, Avtushko was using his own phone to contact both the defendant and Chernov. (Tr. 1234).

II.  The Disappearance of Viktor Alekseyev
     and Fraud Utilizing Alekseyev's Identity

     A.   Viktor Alekseyev's Disappearance

        Viktor Alekseyev, also a Sea Gate resident, disappeared on December 19, 2005.  Alekseyev was scheduled to fly from New York to Moscow, Russia on a direct flight on December 20, 2005. (Tr. 1168).  He had purchased a ticket to return to New York from Russia on March 20, 2006.  (Tr. 99, 1168).  Alekseyev, who had operated a jewelry sales business in the United States for

_____

        [7]   For example, a record detailing a May 20, 2004 communication indicated that "Michael Klein" was adamant about "not stepping into a branch to be identified" and claimed that he had lost his driver's license and passport.  (Tr. 1077; GX 120).

14

several years, had told others that he intended to open a
business in Russia.  (Tr. 99, 616).

Alekseyev made certain preparations in anticipation of
his three-month trip to Russia.  During the Fall of 2005,
Alekseyev obtained a home equity line of credit on 3709 Neptune
Avenue, Brooklyn, New York, a property Alekseyev purchased in
2003 ("3709 Neptune Avenue").  (Tr. 99; GX 219).  Alekseyev told
others about the fact that he obtained the loan and generally
talked openly about his finances.  (Tr. 99, 336, 615).  Alekseyev
made arrangements to rent the basement apartment at 3709 Neptune
Avenue, in which he resided ("Basement Apartment"), to tenants
while he was scheduled to be in Russia.  Alekseyev asked his ex-
girlfriend Tatiana Borodin to collect rent from the tenants
occupying the basement of 3709 Neptune Avenue, as well as the
tenants occupying the remaining floors, while he was away and
also to pay the mortgage on his behalf.  (Tr. 106-107).
Alekseyev also informed Borodin that she should call the
defendant Dmitriy Yakovlev if any of the apartments needed repair
while he was away.  (Tr. 106-107, 619).  Prior to his anticipated
departure to Russia, Alekseyev generally appeared to be doing
well financially and, sometime in December, had even bought
himself a used Patek Philippe men's watch for $5,000.  (Tr 101-
102).

During the evening hours of December 19, 2005, Borodin,
who, in addition to being Alekseyev's ex-girlfriend, sold jewelry

for Alekseyev's jewelry business, visited Alekseyev in the Basement Apartment and stayed for several hours.  (Tr. 104).  One of Borodin's purposes in visiting Alekseyev was to pick up a supply of jewelry from Alekseyev that she could sell while he was in Russia.  (Tr. 104).  After providing jewelry to Borodin, Alekseyev wrote a receipt by hand ("Receipt"), asked Borodin to sign the Receipt, and kept it.  (Tr. 104-106).

Shortly before Borodin left Alekseyev's Basement Apartment on the evening of December 19, 2005, Borodin heard someone enter the hallway that preceded the apartment from a doorway at the back of 3709 Neptune Avenue.  (Tr. 112).  Although she could not see the person who entered, Borodin heard the defendant's voice asking Alekseyev whether he was alone.  When Alekseyev responded that he was not alone and that Borodin was with him, the defendant told Alekseyev that he would come back later.  (Tr. 112).  Borodin left Alekseyev's apartment shortly after she heard the defendant leave, around 8:00 or 9:00 p.m. (Tr. 112).  Borodin intended to return to 3709 Neptune Avenue the next day, however, because she had agreed to take Alekseyev to the airport for his flight to Russia.  (Tr. 100, 113).  Although Borodin returned on December 20, 2005 as planned, she never saw Alekseyev again.  (Tr. 113).

The defendant returned to 3709 Neptune Avenue later on the evening of December 19, 2005, after Borodin left.  Sometime around 9:00 p.m. that evening, Alekseyev's upstairs tenant Raviel

16

Khassanchine left his apartment on the first floor of 3709
Neptune Avenue.  As he was leaving, Khassanchine saw Alekseyev
and the defendant sitting together in the defendant's Ford
Expedition parked immediately in front of 3709 Neptune Avenue.
(Tr. 609, 623-625).  Khassanchine was gone for several hours
before returning to 3709 Neptune Avenue.  (Tr. 625-626).  When he
returned, Khassanchine looked for Alekseyev because Khassanchine
had previously agreed to pay Alekseyev rent before Alekseyev left
for Russia the next day.  (Tr. 622).  Khassanchine was not able
to find Alekseyev that evening; Khassanchine knocked on a window
of the Basement Apartment but no one answered.  (Tr. 626-627).
Khassanchine never saw Alekseyev again.  (Tr. 606).

        Vyashelav Puponov, a friend of Alekseyev's who owned a
video store from which Alekseyev frequently rented Russian
language crime dramas, had planned to meet with Alekseyev
sometime after 9:00 p.m. on the evening of December 19, 2005 to
celebrate Puponov's birthday.  (Tr. 334-337).  Alekseyev did not
show up as expected.  Puponov also never saw or heard from
Alekseyev again.  (Tr. 337-338).

        The next day, December 20, 2005, Borodin arrived at
3709 Neptune Avenue to take Alekseyev to the airport as planned
and found Alekseyev's door unlocked.  (Tr. 114).  Alekseyev,
however, was not there.  Similarly, Alekseyev's friend Irina
Guber, who had arranged with Alekseyev to pick him up when he
arrived in Russia, arrived at the airport in Moscow but could not

17

find Alekseyev.  (Tr. 452-453, 457-458).  Alekseyev never boarded
his flight to Moscow, and did not call the airline to report his
absence.  (Tr. 1169-1170).

   In the days and weeks following Alekseyev's
disappearance, Borodin took various steps in an effort to
determine what happened to Alekseyev.  Borodin attempted to
report Viktor's disappearance to the police, but was rebuffed
because she was not a relative of Alekseyev's.  (Tr. 116-117).
In addition to calling and meeting with Alekseyev's friends in an
attempt to gather information, Borodin also collected and
examined Alekseyev's mail in order to uncover any clues about
Alekseyev's whereabouts.  (Tr. 116, 136).  In doing so, Borodin
discovered that Viktor's credit cards had been used after she
last saw him on December 19, 2005 and specifically that a large
purchase had been made at a jewelry store on 86th Street in
Brooklyn.  (Tr. 137).  Alekseyev's credit card records identified
the jewelry store as JBD Jewelers.  (See GX 221b-c, 205, 206,
608).

   In the weeks following Alekseyev's disappearance,
Borodin spoke to the defendant on the telephone numerous times
and met with him on four occasions.  (Tr. 117, 121-22).  Borodin
first contacted the defendant on December 20, 2005, the day that
Alekseyev was supposed to depart for Russia.  Believing that the
defendant had likely returned to Alekseyev's Basement Apartment
on the evening of December 19, 2005 after Borodin left, as

18

Borodin heard the defendant say he would, Borodin contacted the
defendant and questioned him about his knowledge regarding
Alekseyev's whereabouts.  (Tr. 117).  In the telephone
conversations and meetings that Borodin had with the defendant
following Alekseyev's disappearance, the defendant offered
various explanations for Alekseyev's disappearance and
whereabouts.  Initially the defendant suggested to Borodin that
Alekseyev had traveled to Russia through Mexico.  (Tr. 119).
When Borodin indicated that she did not believe that explanation,
the defendant alternatively suggested that Alekseyev had traveled
through Canada.  (Tr. 119).  At some point, the defendant also
stated that he had been outside of 3709 Neptune Avenue on the
night of December 19, 2005 and had been approached by men wearing
badges who inquired whether Alekseyev resided there.  (Tr. 135).
According to the defendant, he told these men that Viktor did not
live there.  (Tr. 136).  In addition to suggesting these various
explanations for Viktor's disappearance, the defendant also
showed Borodin two documents that belonged to Viktor Alekseyev
that were now in the defendant's possession: the Receipt that
Alekseyev asked Borodin to sign before she left the Basement
Apartment on the evening of December 19, 2005; and a photocopy of
a Bally's Fitness gym membership card in the name "Gennadiy
Borodin" bearing Alekseyev's photograph.  (Tr. 130-133).  Borodin
had previously seen this photocopy of the gym membership card on

Alekseyev's desk in the Basement Apartment.[8]  (Tr. 130-33).  Also
during one of their meetings, the defendant asked Borodin if she
knew the code for Alekseyev's safe and if she had the key.[9]  (Tr.
125).  The defendant further indicated to Borodin that he had
visited a store that specialized in safes in an attempt to find a
key that matched Alekseyev's safe.  (Tr. 125).

B.   The Defendant's Use of Alekseyev's Bank Cards

        The defendant began fraudulently using Alekseyev's
identity soon after Alekseyev's disappearance.  From December 23,
2005 through January 9, 2006, Yakovlev used various credit cards
and bank cards belonging to Alekseyev to purchase goods and
clothing worth thousands of dollars, as well as to obtain cash
advances at Brooklyn ATM locations.  (See GX 607, 608).  In
connection with the credit card purchases at JBD Jewelers using
Alekseyev's credit cards, the defendant fraudulently presented
Alekseyev's New York State driver's license as a means of
identification.  (See Tr. 419-420; GX 221a-c, 240a).  On
December 27, 2007 and December 28, 2005, images of Yakovlev using
Alekseyev's bank cards to withdraw funds from Alekseyev's bank

_____

        [8]   Borodin explained that Alekseyev had posed as her
husband Gennadiy Borodin when she opened the membership at
Bally's Fitness in Brooklyn, thereby explaining why Alekseyev's
photograph appeared on the Bally's Fitness Card bearing the name
"Gennadiy Borodin."  (Tr. 131-32).

        [9]   Multiple witnesses testified that Alekseyev kept some
of his jewelry inventory in a safe at 3709 Neptune Avenue that
locked using both a key and a code that was entered into a keypad
on the safe.  (Tr. 80, 85-86, 450).

accounts were captured by security cameras at a Citibank ATM location in Brooklyn.  (Tr. 408-409; GX 220a, 220j-k, 220m).

C.   <u>Discovery of Alekseyev's Dismembered Remains</u>

During the afternoon of January 8, 2006, an Essex County, New Jersey law enforcement officer discovered severed body parts identified as belonging to Alekseyev in black plastic trash bags in South Mountain Reservation, a New Jersey park in which the defendant had received a summons in 1997.  (Tr. 228-231, 730-731; GX 222, GX 404).  The area of the park where the body parts were discovered is approximately two miles from the Ivy Hill residential apartment complex where the defendant resided in the late 1990s.  (Tr. 1259; GX 260).  Near the black plastic trash bags containing Alekseyev's dismembered body, police recovered a VHS videotape of the Russian crime drama "Bandits of St. Petersburg," a videotape that Alekseyev had previously rented from his friend Puponov's video store.[10]  (Tr. 248-249, 333-334; GX 236).

The examination and autopsy of Alekseyev's body parts indicated that his limbs were dismembered in a manner consistent

---

[10]     A friend of Borodin's who was living in New Jersey told Borodin that she had heard on the news that a  body had been discovered in a park.  (Tr. 139).  Borodin called the police to inquire whether the body might be that of Alekseyev.  (Tr. 140). In addition to calling the police, however, Borodin also called the defendant in order to see how he would react.  (Tr. 141).  In response to being told about the discovery of a dismembered body, the defendant stated "that's interesting that people are chopped up during the daytime now."  (Tr. 141).

with having been done by someone with anatomical knowledge.  (Tr. 819).  Specifically, the defendant disarticulated Alekseyev's joints in such a way that he separated Alekseyev's various body parts without having to cut through any of Alekseyev's bones. (See Tr. 814-815).  In addition, neither femoral head – the top portion of the thigh bone that fits into the hip joint – had any markings indicative of a cutting implement, suggesting the careful and deliberate way in which Alekseyev's thighs were disarticulated from his torso.  (Tr. 825).  The defendant had told Borodin and others that he was trained as a surgeon in Russia, and in a form he submitted to the Immigration and Naturalization Service regarding his personal biographical history, the defendant indicated that he had been employed as a surgeon in Russia prior to immigrating to the United States. (Tr. 76, 731-733, 1039-1040; GX 260).

A dog hair found adhered to the dismembered left arm of Alekseyev was compared to a dog hair recovered from the defendant's Ford Expedition.[11]  Both the dog hair found on Alekseyev's left arm and the dog hair recovered from the defendant's car had the same haplotype, or mitochondrial DNA sequence, such that the two hairs could not be excluded as having originated from the same dog.  (Tr. 1395-1399).  Based on a

---

[11]     Alekseyev never owned a dog.  (Tr. 95).  In addition, Artem Karpushin, the owner of the Ford Expedition at the time the dog hair was recovered from the car and to whom the defendant sold the car, never had a dog inside the car.  (Tr. 364-371).

statistical probability analysis, if one were to randomly select one hundred dogs, one to three of those dogs would have the particular mitochondrial DNA sequence present in both the dog hair recovered from Alekseyev's severed arm and the dog hair found within the car that had belonged to the defendant. (Tr. 1400).

The defendant ceased using Alekseyev's credit and bank cards on January 9, 2006, the day following the discovery of Alekseyev's remains in South Mountain Reservation, but months prior to the positive identification of the remains as those of Alekseyev.  (See Tr. 140-141; GX 607, 608).

D.   Evidence Recovered During Searches
     of the Defendant's Residence

On July 24, 2009, pursuant to a consent search on the day of his arrest, agents searched a safe located in the second floor bedroom closet of the defendant's residence at 4614 Surf Avenue, within the Sea Gate community of Brooklyn, New York ("4614 Surf Avenue"). (Tr. 1238-1239).  Inside the safe, agents found 11 watches, including a used men's Patek Philippe watch that Borodin identified as the watch Alekseyev purchased in December 2005.  (Tr. 102-103, 1238-39; GX 246).  The rear side of that particular watch was inscribed, in Russian, "N.Y. To Dmitriy From Friends, 8.25.05."  (Tr. 1240; GX 246, 246d).  Agents also seized a Dell computer from the defendant's residence. (Tr. 1240).  A forensic examination of one of the computers

revealed that the defendant had scanned copies of the Receipt that Alekseyev had Borodin sign on December 19, 2005 as well as the Bally's Fitness gym membership card in the name "Gennadiy Borodin." (Tr. 1252-1253; GX 225, 228).

On February 1, 2011, pursuant to a consent search, agents retrieved a black file box located on a shelf in an office on the second floor of 4614 Surf Avenue. (Tr. 1264-1265). The black file box contained various papers belonging to the defendant as well as the original Russian birth certificate of Viktor Alekseyev. (Tr. 1265; GX 258).

E.   The Defendant's Post-Arrest Statements

During a post-arrest interview on July 24, 2009, the defendant was asked whether he had ever used credit cards belonging to anyone else. (Tr. 1242). At first, the defendant indicated that he had never done so. (Tr. 1242). He then stated that he had used the credit cards of someone named "Viktor" who the defendant claimed had given the defendant his credit cards as a form of repayment for a $30,000 loan and had gone to Russia. (Tr. 1243-44).

III. The Disappearance of Irina Malezhik
     and Fraud Utilizing Malezhik's Identity

A.   Malezhik's Disappearance

At 1:40 p.m. on the afternoon of October 15, 2007, an image of Irina Malezhik, a Russian language translator, was captured on a security camera located in the lobby of her

24

apartment building at 200 Corbin Place in the Brighton Beach
section of Brooklyn, New York ("200 Corbin Place").  (Tr. 495-
496, GX 340).  Malezhik exited 200 Corbin Place through the back
entrance, which opened onto the corner of Brighton Beach Avenue
and Brighton 15th Street.  (Tr. 486, 497-500, GX 600).  Malezhik
was never seen nor heard from again.  (See Tr. 39).

Approximately fifteen minutes before Malezhik was
captured on the security camera exiting 200 Corbin Place, at 1:26
p.m., Malezhik used her cellular telephone ("Malezhik's Cell
Phone") to call Olga Fisher, a friend of Malezhik's with whom
Malezhik frequently spent time walking on the boardwalk.  (Tr.
29-30, 1225).  Minutes after her phone call to Fisher, Malezhik
received two phone calls from a pay telephone located near 200
Corbin Place at the Shama Restaurant ("Shama Payphone").[12]  (Tr.
1225).  One of the calls from the Shama payphone was to
Malezhik's Cell Phone, and the other was to her home telephone.
(Tr. 1225).  Ten minutes after receiving these calls from the
Shama Payphone, Malezhik exited the back entrance of 200 Corbin
Place, never to be seen again.  (Tr. 495-96, GX 340).

B.   The Defendant's Use of Malekzhik's Identity

The defendant and his wife Julia Yakovlev began to
fraudulently use Irina Malezhik's identity shortly after

_____

[12]   The Shama Payphone is located along the most direct
driving route between the defendant's residence at 4614 Surf
Avenue and 200 Corbin Place. (Tr. 1260-61).

Malezhik's disappearance on October 15, 2007.  Less than three
hours after Malezhik exited 200 Corbin Place, Dmitriy and Julia
Yakovlev began using Malezhik's Cell Phone to call her credit
card companies.  (See Tr. 1226).  In fact, between 4:12 p.m. and
8:47 p.m. on October 15, 2007, fourteen telephone calls were made
from Malezhik's Cell Phone to her credit card companies.  (Tr.
1226).  During one of those calls, an individual purporting to be
Malezhik sought and obtained authorization from a Discover card
representative to use Malezhik's Discover credit cards to
withdraw cash from ATMs, a function that had never before been
activated.  (Tr. 871-74, GX 306, GX 308).  Also on October 15,
2007, Dmitriy and Julia Yakovlev deposited four checks belonging
to Malezhik totaling $6,475 – checks made payable to Malezhik and
checks drawn on Malezhik's Citibank accounts – into the Yakovlev
Citibank Account.  (See Tr. 664-71, GX 609).  The checks bore the
purported signatures or endorsements of Malezhik.  (GX 313,
314a-b, 317, 317a, 609).

        The next day, October 16, 2007, Dmitriy and Julia
Yakovlev began using Malezhik's credit cards to purchase
thousands of dollars worth of goods at retail stores and to
obtain cash advances at Brooklyn ATM locations.  (See 671-76, GX
610).  Also on October 16, 2007, Julia Yakovlev, purporting to be
Malezhik, contacted Gala Gabinsky, a Brooklyn-based high-end
watch dealer, to inquire about the purchase of either a Patek
Philippe or Franck Muller watch.  (Tr. 535-37).  Ultimately, in a

series of communications and meetings between Julia Yakovlev and
Gabinsky that occurred between October 16 and October 22, 2007,
Julia Yakovlev purchased two Franck Muller watches using
Malezhik's credit cards, a men's Franck Muller Master Banker
watch and a women's Franck Muller watch.  (Tr. 536-64).  Gabinsky
identified Julia Yakovlev as the woman who posed as Irina
Malezhik during those purchases.  (Tr. 565-66, GX 322b-e).  In
addition to using Malezhik's credit cards to make these
purchases, Julia Yakovlev also repeatedly used Malezhik's Cell
Phone to communicate with Gabinsky, and presented Malezhik's
Social Security card as well as multiple credit cards in the name
of Irina Malezhik to Gabinsky as means of identification.[13]  (Tr.
550-552, 558-559, GX 323).  In connection with the watch
purchases, Gabinsky prepared two invoices, each of which Julia
Yakovlev fraudulently signed in the name of Irina Malezhik.  (See
Tr. 553, 563, GX 343, 343a, 343e).[14]  The total billed to

---

[13]     Julia Yakovlev provided Malezhik's Cell Phone number to
Gabinsky and, at times, Gabinsky left voice mail messages on
Malezhik's Cell Phone that Julia Yakovlev would then return. (Tr.
558-59).  Malezhik's friend Olga Fisher noted that, after
Malezhik's disappearance, she repeatedly attempted to contact
Malezhik on Malezhik's Cell Phone.  (Tr. 34).  Fisher noted that
while, at times, Malezhik's voice mail would indicate that the
mailbox was full and could not receive messages, Fisher was
subsequently able to leave messages for Malezhik.  (Tr. 34).  It
is thus clear that Dmitriy and Julia Yakovlev would listen to,
and erase, messages left on Malezhik's Cell Phone in the period
following her disappearance.

[14]     Forensic analysis determined that one of the two watch
invoices bore Julia Yakovlev's fingerprint.  (Tr. 589).

Malezhik's credit cards for the two Franck Muller watches was approximately $16,000.  (GX 343, 343a, 343e).

In addition to using Malezhik's credit cards to purchase high-end watches, Dmitriy and Julia Yakovlev also used Malezhik's credit cards to fund shopping sprees at Century 21 department store locations on both October 16, 2007 and October 19, 2007.  (See Tr. 672).  While using Malezhik's credit cards at a Century 21 department store located in Westbury, New York on October 19, 2007, images of both Dmitriy and Julia Yakovlev were captured on a security video at a register at the time of the purchases.  (GX 322, 322a).

Ultimately, over a period of nine days, the defendant and his wife Julia Yakovlev stole approximately $35,500 from Malezhik's accounts.  (GX 609, GX 610)

C.   Evidence Recovered During Searches
     of the Defendant's Residence

When the defendant was arrested on July 24, 2009, agents searched a safe located in the second floor bedroom closet of the defendant's residence at 4614 Surf Avenue.  Inside that safe, agents found the men's Franck Muller Master Banker watch (bearing the same serial number) that the Yakovlevs purchased from Gabinsky using Malezhik's credit cards.  (GX 318, GX 325b).  The only difference was that the Franck Muller Master Banker watch now had an inscription that read "Dmitriy Yakovlev '07"

that it did not have at the time Gabinsky sold the watch to Julia Yakovlev. (Tr. 565).

D.   The Defendant's Post-Arrest Statements

During his post-arrest interview on July 24, 2009, Dmitriy Yakovlev admitted that he had used Malezhik's credit cards. (Tr. 1245). The defendant indicated that Malezhik had given him her credit cards in order to repay a $20,000 loan that the defendant had given her. (Tr. 1245). When asked why he took significantly more than $20,000 from Malezhik's account, Dmitriy Yakovlev offered no explanation. (Tr. 1248). The defendant further denied ever having Malezhik's social security card or cellular telephone.[15] (Tr. 1250-1251). The defendant did, however, tell agents that he last saw Malezhik when she exited 200 Corbin Place through the back entrance. (Tr. 1246). On that occasion, according to the defendant, Malezhik got into the defendant's car and gave him her credit cards. (Tr. 1246-1248). According to the defendant, he never saw or heard from Malezhik after that occasion. (Tr. 1248).

On August 17, 2009, nearly two years after Malezhik disappeared, agents conducting a search of the defendant's basement at 4614 Surf Avenue found a pair of women's underwear in the boiler room, on the floor amidst tools and equipment. (Tr.

---

[15]   When agents confronted Dmitriy Yakovlev by explaining that they knew that Malezhik's Cell Phone had been used to contact her credit card companies after her disappearance, he replied "ahhh, yeah" and nodded his head. (Tr. 1251).

29

74, GX 326, GX327e-f).  DNA analysis subsequently revealed that
the underwear belonged to Malezhik.  (Tr. 798-799).


<u>ARGUMENT</u>

THE COURT SHOULD DENY THE DEFENDANT'S MOTIONS
<u>FOR A JUDGMENT OF ACQUITTAL OR A NEW TRIAL</u>

        The defendant now challenges his conviction pursuant to
Rules 29 and 33 of the Federal Rules of Criminal Procedure and
moves the Court to enter a judgment of acquittal on each of the
15 counts of conviction or alternatively, order a new trial.  The
defendant's motion only specifically challenges, however, his
conviction of conspiracy to commit bank fraud using Michael
Klein's identity in Count One of the Indictment (<u>see</u> Def.'s Ltr.
at 1-2), and the defendant's conviction for having committed the
fraudulent use of, and the conspiracy to fraudulently use, means
of identification of Viktor Alekseyev and Irina Malezhik in
connection with the murder of Alekseyev and Malezhik as charged
in Counts Six, Thirteen and Fourteen.  (<u>See</u> Def.'s Ltr. at 2-4).
For the reasons set forth below, the defendant's motions should
be denied.

I.   <u>Legal Standards</u>

     A.   <u>Rule 29</u>

        Pursuant to Rule 29(c) of the Federal Rules of Criminal
Procedure, a court may enter a judgment of acquittal following a
jury's guilty verdict only if "no rational trier of fact could

30

have found the defendant guilty beyond a reasonable doubt."
United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003); see
also United States v. MacPherson, 424 F.3d 183, 187 (2d Cir.
2005) (A "court may grant a judgment of acquittal only if it is
convinced that 'the evidence that the defendant committed the
crime alleged is nonexistent or so meager that no reasonable jury
could find guilt beyond a reasonable doubt.'") (citation
omitted); United States v. Canady, 126 F.3d 352, 356 (2d Cir.
1997) (explaining that a court "must affirm the conviction so
long as, from the inferences reasonably drawn, the fact finder
might fairly have found guilt beyond a reasonable doubt"). A
defendant challenging the sufficiency of the evidence against him
"bears a very heavy burden." United States v. Scarpa, 913 F.2d
993, 1003 (2d Cir. 1990) (internal quotation marks and citation
omitted).

     In reviewing a challenge under Rule 29, the court must
view the trial evidence "in the light most favorable to the
government." Canady, 126 F.3d at 356 (internal quotation marks
and citations omitted). Indeed, "[m]atters of the choice between
competing inferences, the credibility of the witnesses, and the
weight of the evidence are within the province of the jury, and
[the Court is] not entitled to second-guess the jury's
assessments." United States v. Rea, 958 F.2d 1206, 1221-22 (2d
Cir. 1992). In addition, the Court must review the evidence
offered at trial "as a whole, 'not in isolation.'" Canady, 126

31

F.3d at 356 (quoting <u>United States v. Podlog</u>, 35 F.3d 699, 705 (2d Cir. 1994)).  Furthermore, it is well-established that "the jury's verdict may rest entirely on circumstantial evidence." <u>United States v. Jackson</u>, 335 F.3d 170, 180 (2d Cir. 2003) (citation omitted).

 B. <u>Rule 33</u>

   Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  In deciding a Rule 33 motion:

> The test is whether "it would be a manifest injustice to let the guilty verdict stand." <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting <u>United States v. Reed</u>, 875 F.2d 107, 114 (7th Cir. 1989)). For a trial judge to grant a Rule 33 motion, he must harbor "a real concern that an innocent person may have been convicted." <u>United States v. Parkes</u>, 497 F.3d 220, 232 (2d Cir. 2007) (quoting <u>United States v. Ferguson</u>, 246 F.3d 129, 134 (2d Cir. 2001)).

<u>United States v. Guang</u>, 511 F.3d 110, 119 (2d Cir. 2007). Accordingly, the Second Circuit has advised that a district court should exercise such authority "in the most extraordinary circumstances."  <u>United States v. Locascio</u>, 6 F.3d 924, 949 (2d Cir. 1993); <u>Sanchez</u>, 969 F.2d at 1414 (a district court's discretion to grant a new trial under Rule 33 should be exercised "sparingly").

II.  Analysis

    A.  The Evidence of Bank Fraud Conspiracy Using
        Klein's Identity Was Sufficient

        The defendant contends that there was insufficient
evidence that the defendant participated in the conspiracy to
commit bank fraud charged in Count One of the Indictment, i.e.,
the conspiracy to defraud Bank of New York and Washington Mutual
Bank through the use of Michael Klein's identity, following
Klein's disappearance.  The gravamen of the defendant's argument
is that there was insufficient proof of a criminal agreement
between the defendant and co-conspirator Sergey Avtushko. (Def.'s
Ltr. at 1-2).  Principally, the defendant relies on Avtushko's
testimony that Avtushko did not think he was doing anything wrong
when he, among other things, assisted the defendant in setting up
the Washington Mutual Account in Klein's name using Klein's
identification and contacted the bank regarding issues with the
account after the defendant deposited Klein's $348,519 Bank of
New York check into the account by ATM.  (See id. at 2).
Avtushko testified that he realized that he was engaging in wrong
doing once the bank informed him that "Michael Klein" would have
to appear personally in a Florida branch and the defendant asked
Avtushko whether Avtushko knew anyone who could go into the bank
impersonating Klein.  (See Tr. 1106-07, 1158-59 ("I realized [it
was illegal] when somebody need[ed] to go to the bank and show
the ID.")).  The defendant claims this testimony gives reason for

33

the Court to overturn the jury's verdict as to the conspiracy charged in Count One.  He is mistaken.

The defendant's claim that "Avtushko unequivocally stated that he never engaged in any agreement with the defendant to commit any crime," (Def.'s Ltr. at 1), is belied by the evidence, including Avtushko's testimony.  Avtushko testified that he knew that what he, the defendant and Chernov were doing was "completely wrong" once the defendant asked whether he knew someone who could pretend to be Michael Klein and the defendant told Avtushko that Avtushko and Chernov would be paid if the scheme was successful.  (Tr. 1165-66).  In addition, Avtushko acknowledged that he questioned the legitimacy of his actions when Avtushko learned from the defendant that the defendant had deposited over $300,000 in the Washington Mutual Account at an ATM; prior to the defendant's request to find someone to act as Klein.  (Tr. 1164).  Avtushko also stated that while he thought the defendant was telling him the truth when the defendant said his "client" ("Klein") was "okay" with using his identity, after Avtushko "put[] all [his] feelings and thoughts away," he understood that establishing the account using Klein's identity and attempting to access the funds within it was illegal. (Tr. 1159-60).

Moreover, Avtushko's subjective beliefs during the course of the scheme does not diminish the proof of the participation of Chernov – another co-conspirator – as the

34

defendant suggests.  (See Def.'s Ltr. at 2).  The trial evidence showed that: Chernov agreed to allow his parents' address to be used as the address for the Washington Mutual Account (Tr. 1098-99); Chernov would send documents related to the account to the defendant in New York (Tr. 1101-02); and when Yakovlev requested that Avtushko find someone to impersonate Klein, Avtusko put the defendant in touch with Chernov.  (Tr. 1106-07).  Furthermore, telephone records indicated that Avtushko was in contact with both the defendant and Chernov at and around the times the defendant and Avtushko were using the Fraud Phone to contact Washington Mutual Bank.[16]  (Tr. 1234).

All of this evidence, taken together and viewed in the light most favorable to the government, was sufficient for the jury to reasonably conclude that the defendant, Avtushko and Chernov were involved in a conspiracy to defraud Washington Mutual using Michael Klein's identity.  Indeed, as the Second Circuit has observed, "[t]he traditional deference accorded to a jury's verdict is especially important when reviewing a

---

[16]    The defendant's argument that Chernov's participation in the conspiracy charged in Count One is belied by the lack of telephone records showing calls between the defendant and Chernov, (see Def.'s Ltr. at 2), is of little moment.  Federal Bureau of Investigation Special Agent Alexey Abrahams testified that only "limited" records related to Chernov's home telephone were available.  (Tr. 1280).  In any event, the lack of evidence showing telephone contact between the defendant and Chernov does not diminish any of the other evidence on which the jury could have reasonably relied to find the defendant guilty of Count One.

conviction for conspiracy . . . because a conspiracy by its very
nature is a secretive operation, and it is a rare case where all
aspects of a conspiracy can be laid bare in court with the
precision of a surgeon's scalpel." <u>Jackson</u>, 335 F.3d at 180
(citing <u>United States v. Pitre</u>, 960 F.2d 1112, 1121 (2d Cir.
1992)).  Accordingly, the defendant's motions under Rules 29 and
33 with respect to Count One should be denied.

      B.   The Evidence that the Defendant Fraudulently Used
           Alekseyev and Malezhik's Identities in Connection
           <u>With Their Murders Was Sufficient</u>

       The defendant argues that the evidence presented at
trial was insufficient with respect to Dmitriy Yakovlev's
conviction for committing the crimes charged in Counts Six,
Thirteen and Fourteen (<u>i.e.</u>, the fraudulent use of, and the
conspiracy to fraudulently use, means of identification of Viktor
Alekseyev and Irina Malezhik) in connection with the murder of
Alekseyev and the murder of Malezhik, in violation of 18 U.S.C.
§ 1028(b)(3)(B).  Specifically, the defendant asserts that
because, with respect to both Malezhik and Alekseyev, the
government did not present or prove a "time, place or manner" of
death, no reasonable jury could have convicted the defendant.
(Def.'s Ltr. at 3-4).  As set forth in the statement of facts,
however, the evidence was more than sufficient to support the
jury's verdict.  <u>See Jackson</u>, 335 F.3d at 180 ("[T]he jury's
verdict may rest entirely on circumstantial evidence.").  With

respect to Dmitriy Yakovlev's use of Alekseyev's means of
identification in connection with his murder, the evidence
established the following facts:

- Alekseyev disappeared sometime between the evening of
  December 19, 2005 and December 20, 2005, the day on
  which he was scheduled to fly from New York to Moscow,
  Russia on a direct flight.  (Tr. 1168).

- Alekseyev had no intention to disappear; in fact, he
  intended to investigate the possibility of opening a
  business and spend time with family in Russia, and
  return to the United States on March 20, 2006
  consistent with the return ticket he had purchased.
  (Tr. 99, 616, 1168).

- Dmitriy Yakovlev was the last person seen with
  Alekseyev prior to Alekseyev's disappearance on the
  evening of December 19, 2005.  (Tr. 112, 609, 623-625).
  Specifically, Khassanchine observed Alekseyev sitting
  in Dmitriy Yakovlev's Red Ford Expedition outside of
  Alekseyev's residence sometime around 9:00 pm.   (Tr.
  609, 623-625).  Although Alekseyev had plans to visit
  Puponov, a friend, later that evening, Alekseyev did
  not show up to visit his friend as planned. (Tr. 334-
  338).

- In the weeks following Alekseyev's disappearance,
  Dmitriy Yakovlev offered various, non-sensical
  explanations for Alekseyev's disappearance to
  Alekseyev's friends.  (Tr. 119, 135-136).

- After Alekseyev's disappearance, Dmitriy Yakovlev had a
  number of personal items of Alekseyev's that he had no
  legitimate reason to have, including: 1) the Receipt
  that Alekseyev asked Borodin to sign before she left
  the Basement Apartment on the evening of December 19,
  2005; 2) a photocopy of a Bally's Fitness gym
  membership card that Borodin had previously seen on
  Alekseyev's desk in the Basement Apartment; 3)
  Alekseyev's bank and credit cards; 4) Alekseyev's
  driver's license; 5) Alekseyev's safe; 6) Alekseyev's
  original Russian birth certificate; and 7) Alekseyev's
  Patek Philippe watch, which agents found in a safe at
  the Yakovlevs' residence approximately four years after

his disappearance.  (See Tr. 102-103, 125, 130-133, 408-409, 419-420, 1238-1239, 1264-1265; GX 246, 258).

- Within days of Alekseyev's disappearance, between December 23, 2005 and January 9, 2006, Yakovlev used various credit cards and bank cards belonging to Alekseyev to purchase goods and clothing worth thousands of dollars, as well as to obtain cash advances at Brooklyn ATM locations.  (See GX 607, 608). On two occassions, December 27, 2005 and December 28, 2005, images of Yakovlev using Alekseyev's bank cards to withdraw funds from Alekseyev's bank accounts were captured by Citibank ATM security cameras in Brooklyn. (Tr. 408-409; GX 220a, 220j-k, 220m).

- Alekseyev's dismembered remains were discovered on January 8, 2006 in South Mountain Reservation, a New Jersey park near the Ivy Hill residential apartment complex where the defendant resided in the late 1990s. Dmitriy Yakovlev's familiarity with that park was confirmed by a summons that Dmitriy Yakovlev had received in South Mountain Reservation in 1997. (Tr. 228-231, 730-731, 1259; GX 222, 260, 404).

- Dmitriy Yakovlev had been trained as a surgeon in Russia prior to immigrating to the United States and the autopsy of Alekseyev's remains indicated that he was dismembered in a manner consistent with a knowledge of human anatomy.  (Tr. 76, 731-733, 819, 1039-1040; GX 260).

- A forensic examination of a dog hair found adhered to the cut surface of Alekseyev's dismembered arm was compared to a dog hair recovered from the defendant's Ford Expedition.  Both hairs had the same mitochondrial DNA sequence that, in a random sample of one hundred

dogs, would only occur in one to three dogs. (Tr. 1395-1399, 1400).[17]

- Dmitriy Yakovlev use of Alekseyev's credit and bank cards stopped on January 9, 2006, the day following the discovery of Alekseyev's remains in South Mountain Reservation, but months prior to the identification of the remains as those of Alekseyev. (See Tr. 140-141; GX 607, 608).

With respect to Dmitriy Yakovlev's use of, and conspiracy to use, Malezhik's means of identification in connection with her murder, the evidence established the following facts:

- Malezhik was last seen exiting the back entrance of 200 Corbin Place at approximately 1:40 pm on October 15, 2007. (Tr. 495-500; GX 340, 600). Sometime after she exited the building, she disappeared. (Tr. 550-552, 558-559, 664-671, 871-874, 1226).

- Less than three hours after Malezhik exited 200 Corbin Place and disappeared, Dmitriy and Julia Yakovlev had in their possession, and began to use, various items belonging to Malezhik. The defendant and Julia Yakovlev had Malezhik's credit cards, her social security card, her cellular telephone and various checks that belonged to Malezhik.

_____

[17]     The defendant suggests that because 1) Avtushko testified that he was "told" that the defendant's dog was an American Staffordshire (see Tr. 1091) and 2) the mitochondrial DNA sequence found in both dog hairs that were analyzed was different from the mitochondrial DNA sequence found in a purebred American Staffordshire in one of the databases used by Forensic Examiner Beth Wictum (see Tr. 1404), the dog hair on Alekseyev's arm could not have belonged to the defendant's dog. (Def.'s Ltr. at 3). The defendant's argument, however, disregards the fact that 1) Wictum did not testify that she would expect the same mitochondrial DNA sequence to occur in all purebred American Staffordshires, and 2) there is no indication that the unidentified person who "told" Avtushko that the defendant's dog was an American Staffordshire was correct, or that the dog was, in fact, a purebred.

- Between 4:12 p.m. and 8:47 p.m. on October 15, 2007, Dmitriy and Julia Yakovlev made fourteen telephone calls to Malezhik's credit card companies using Malezhik's Cell Phone. (See Tr. 1226). During one of those calls, the defendant and Julia Yakovlev were able to obtain authorization from Discover card to use Malezhik's credit cards to withdraw cash from ATMs. (See Tr. 871-74; GX 306, 308). Also on October 15, 2007, Dmitriy and Julia Yakovlev deposited four checks belonging to Malezhik totaling $6,475 into the Yakovlev Citibank Account. (See Tr. 664-71; GX 609).

- In a series of telephone conversations and meetings between October 16, 2007 and October 22, 2007, Julia Yakovlev, impersonating Malezhik, negotiated with Gala Gabinsky, a Brooklyn-based high-end watch dealer, about the purchase of certain watches and ultimately bought two Franck Muller watches using Malezhik's credit cards. (Tr. 535-37). One of the watches was a men's Franck Muller Master Banker watch that, approximately two years later, agents located in a safe in Dmitriy Yakovlev's bedroom at 4614 Surf Avenue. In the context of the negotiation and sale of the two Franck Muller watches, the Yakovlev's used Malezhik's credit cards, her social security card, and her cell phone. (Tr. 550-552, 558-559; GX 323). Julia Yakovlev's fingerprint was later recovered on one of the watch invoices prepared by Gabinsky. (Tr. 589).

- Between October 16, 2007 and October 23, 2007, Dmitriy and Julia Yakovlev used Malezhik's credit cards to purchase thousands of dollars worth of goods at retail stores and to obtain cash advances at Brooklyn ATM locations. (See 671-76; GX 610). While using Malezhik's credit cards at a Century 21 department store located in Westbury, New York on October 19, 2007, images of both Dmitriy and Julia Yakovlev were captured on a security video at a register at the time of the purchases. (GX 322, 322a).

- Approximately two years after Malezhik's disappearance, agents found a pair of women's underwear, which DNA analysis confirmed belonged to Malezhik, in the boiler room of the Yakovlevs' basement. (Tr. 74, 798-799; GX 326, 327e-f).

- During his post-arrest interview on July 24, 2009, Dmitriy Yakovlev unwittingly admitted to having been the last person to see Malezhik alive. Specifically, the defendant told agents that he last saw Malezhik when she exited 200 Corbin Place through the back entrance. (Tr. 1246). On that occasion, according to the defendant, Malezhik got into the his car and gave him her credit cards. (Tr. 1246-1248). According to the defendant, he never saw or heard from Malezhik after that occasion. (Tr. 1248). The evidence at trial showed that Dmitriy and Julia Yakovlev were in possession of, and using, Malezhik's Cell Phone and credit cards within hours of her disappearance. Dmitriy Yakovlev's admission that he last saw Malezhik when he obtained her credit cards after she exited the back entrance of 200 Corbin Place thus leads to the clear inference that the defendant was the last person with Malezhik prior to her disappearance on October 15, 2007.

Given the overwhelming circumstantial evidence presented connecting the defendant to the murders of Alekseyev and Malezhik, it is beyond question that the jury could reasonably find the defendant guilty beyond a reasonable doubt. See MacPherson, 424 F.3d at 187 (courts "may grant a judgment of acquittal only if it is convinced that 'the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt'"). Moreover, although the defendant cites Rule 33, he offers no support for his assertion that "it would be a manifest injustice to let the guilty verdict stand." Sanchez, 969 F.2d at 1414. Here, the jury's verdict was wholly consistent with the weight of the evidence. Parkes, 497 F.3d at 232 (holding that,

for a trial judge to grant a Rule 33 motion, he must harbor "a real concern that an innocent person may have been convicted").

    C.    The Defendant Has Not Raised Any Specific Claim Regarding the Remaining Counts of Conviction

As noted above, while the defendant seeks a judgment of acquittal or a new trial as to each of the fifteen counts of conviction, he does not make any specific argument as to any of the counts other than Counts One, Six, Thirteen and Fourteen. As such, he does not set forth any claim that the evidence as to any of those other counts was insufficient or that a manifest injustice has occurred as a result of his conviction on those counts. Accordingly, his Rule 29 and Rule 33 motions regarding each of the remaining counts of conviction not specifically addressed in his papers should be denied.

* * *

In sum, viewing the evidence as a whole, there is more than sufficient evidence that the defendant Dmitriy Yakovlev committed the crimes of which he was convicted. Accordingly, the defendant's respective convictions as to each count should stand.

CONCLUSION

For the foregoing reasons, the defendant's post-trial
motions should be denied in their entirety.

Dated:      Brooklyn, New York
            April 22, 2011

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney

                              /s/James D. Gatta
                         By:  /s/Amanda Hector
                              James D. Gatta
                              Amanda Hector
                              Assistant U.S. Attorneys
                              (718) 254-6356/6212

43